Brittany L. NOFFKE, by her guardian ad litem, Mart W. Swenson, Thad Noffke and Tina Kropelin, Plaintiffs-Appellants-Petitioners,

v.

Kevin BAKKE and American Family Mutual Insurance Company, Defendants-Respondents-Petitioners,

HOLMEN HIGH SCHOOL, Holmen Area School District and Wausau Underwriters Insurance Company, Defendants-Respondents,

GUNDERSEN LUTHERAN HEALTH PLAN, INC., and Atrium Health Plan, Inc., Defendants.

Supreme Court

*No. 2006AP1886. Oral argument October 8, 2008.
—Decided January 27, 2009.*

2009 WI 10

(Also reported in 760 N.W.2d 156.)

350

353

354

For the plaintiffs-appellants-petitioners there were briefs filed by *Tracy N. Tool* and *Bye, Goff, Rohde & Skow, Ltd.,* River Falls, and *Mart W. Swenson* and *Laman & Swenson Law Office,* Eau Claire, and oral argument by *Tracy N. Tool.*

For the defendants-respondents-petitioners there were briefs by *Kara M. Burgos, James S. Naugler,* and *Moen Sheehan Meyer, Ltd.,* La Crosse, and oral argument by *James S. Naugler.*

For the defendants-respondents there was a brief by *Peggy E. Van Horn* and the *Law Offices of Thomas P. Stilp,* Brookfield, and oral argument by *Peggy E. Van Horn.*

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is

a review of a published court of appeals' decision[1] that affirmed in part and reversed in part the decision of the La Crosse County Circuit Court, Dale T. Pasell, Judge. The circuit court granted summary judgment in favor of the defendants and thus granted immunity to both Kevin Bakke (hereinafter "Bakke") and the "school district," which includes Holmen High School, the Holmen Area School District, and Wausau Underwriters Insurance Company. When Brittany Noffke (hereinafter "Noffke") appealed, the court of appeals affirmed in part and reversed in part the circuit court's decision to grant summary judgment. The court of appeals concluded that while the school district was immune from liability, Bakke was not entitled to such immunity. Both Bakke and Noffke petitioned this court for review, which we granted. We agree with the circuit court's decision and therefore affirm in part and reverse in part the court of appeals' decision.

¶ 2. This case presents the following three issues: First, is Bakke immune from a negligence suit arising out of an incident that occurred while he was participating as a cheerleader at Holmen High School? We conclude that, pursuant to Wis. Stat. § 895.525(4m)(a) (2005–06),[2] Bakke is immune from liability because he was participating in a recreational activity that includes physical contact between persons in a sport involving amateur teams. Second, did the circuit court err when it concluded as a matter of law that Bakke was not reckless? We conclude that the circuit court did not err

[1] *Noffke v. Bakke,* 2008 WI App 38, 308 Wis. 2d 410, 748 N.W.2d 195.

[2] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated. The text of both Wis. Stat. §§ 895.525(4m)(a) and 893.80(4) can be found in ¶¶ 14 and 40, respectively.

when it concluded as a matter of law that Bakke was not reckless. Third, we must determine whether Wis. Stat. § 893.80(4) provides the school district with immunity for the alleged negligent acts of the cheerleading coach. We conclude that the school district is immune because no ministerial duty was violated by the cheerleading coach and there was no known and compelling danger that gave rise to a ministerial duty.

## I. FACTS

¶ 3. The facts are not disputed by either party. Noffke was a varsity basketball cheerleader. On December 17, 2004, in the "Commons" of Holmen High School, Noffke fell while practicing a cheerleading stunt before a basketball game. The stunt was performed without any mats. Tragically, Noffke fell backward, her head struck the tile floor, and she was injured.

¶ 4. Three cheerleaders were involved in this "post-to-hands" stunt. These participants had not previously performed this stunt together. Noffke was the "flyer," i.e., the person who stands on the shoulders of the "base." The base is not involved in this litigation. Bakke was the "post."

¶ 5. By way of background, the post helps the flyer get into position on the base and initially supports most of the flyer's weight until her feet are secured on the base's shoulders. The post may also serve as the spotter after the flyer is on the base. Once Noffke was on the base and Bakke let go of her, Bakke was to go behind the base, but in this case, Bakke moved to the front. As a result, when Noffke fell backward, no one was there to prevent her injury. In addition, her cheerleading coach, a Holmen Middle School teacher, was

approximately ten feet away supervising another group of cheerleaders and thus was unable to prevent Noffke's fall.

## II. PROCEDURAL HISTORY

¶ 6. Noffke brought suit against Bakke for negligently failing to properly spot Noffke, and she also sued the school district alleging that the school's cheerleading coach was negligent by failing to provide a second spotter and failing to require the use of mats.

¶ 7. Bakke moved for summary judgment asserting that he was immune from liability by virtue of Wis. Stat. § 895.525(4m)(a). The school district moved for summary judgment asserting that it was immune from liability by virtue of Wis. Stat. § 893.80(4). The circuit court granted summary judgment in favor of Bakke and the school district, and thus, both were provided immunity.

¶ 8. The court of appeals affirmed in part and reversed in part the circuit court's decision. It concluded that Bakke was not entitled to immunity because cheerleading does not involve the type of physical contact that the legislature sought to immunize from negligence lawsuits. The court of appeals, however, affirmed the circuit court's decision to grant the school district immunity.

## III. STANDARD OF REVIEW

■■

¶ 9. Whether the circuit court properly granted summary judgment is a question of law that this court reviews de novo. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). This court

applies the same standards as the circuit court. *Verdoljak v. Mosinee Paper Corp.,* 200 Wis. 2d 624, 630, 547 N.W.2d 602 (1996). Statutory interpretation is a question of law that this court reviews de novo while benefiting from the lower courts' analyses. *Megal Dev. Corp. v. Shadof,* 2005 WI 151, ¶ 8, 286 Wis. 2d 105, 705 N.W.2d 645.

## IV. ANALYSIS

¶ 10. This case requires us to interpret Wis. Stat. §§ 895.525(4m)(a) and 893.80(4). "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. This court begins statutory interpretation with the language of a statute. *Id.,* ¶ 45. If the meaning of the statute is plain, we ordinarily stop the inquiry and give the language its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* A dictionary may be utilized to guide the common, ordinary meaning of words. *Id.,* ¶ 53; *State v. Sample,* 215 Wis. 2d 487, 499–500, 573 N.W.2d 187 (1998).

¶ 11. The context and structure of a statute are also important to the meaning of a statute. *Kalal,* 271 Wis. 2d 633, ¶ 46. "Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results."

*Id.* The "[s]tatutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." *Id.* "A statute's purpose or scope may be readily apparent from its plain language or its relationship to surrounding or closely-related statutes—that is, from its context or the structure of the statute as a coherent whole." *Id.*, ¶ 49.

¶ 12. " 'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.' " *Id.*, ¶ 46 (citation omitted). If statutory language is unambiguous, we do not need to consult extrinsic sources of interpretation. *Id.* " 'Statutory interpretation involves the ascertainment of meaning, not a search for ambiguity.' " *Id.*, ¶ 47 (citation omitted). "[A] statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses." *Id.* The test for ambiguity keeps the focus on the text of the statute, and as a result, a disagreement about the statutory meaning is not enough to render a statute ambiguous. *Id.* The test inquires whether " 'well-informed persons *should have* become confused,' " i.e., does the language reasonably give rise to different meanings. *Id.* (citation omitted).

A. Bakke's immunity from negligence

¶ 13. Whether Bakke is immune from liability in the case at hand involves the interpretation of Wis. Stat. § 895.525(4m)(a) as that statute relates to the allegations of Bakke's negligence. We first address the language of the statute in order to determine if Bakke is qualified to receive immunity from a negligence suit

362

arising out of an incident that occurred while he was participating as a cheerleader at Holmen High School. Noffke argues that Wis. Stat. § 895.525(4m)(a) provides immunity only to those persons who are competing in a contact sport. As a result, she asserts that cheerleading is neither competitive nor a contact sport, and thus, Noffke argues that Bakke is not entitled to immunity. Bakke argues that the plain language of the statute renders him immune from negligence because cheerleading involves physical contact between persons. We agree with Bakke and conclude that pursuant to Wis. Stat. § 895.525(4m)(a), Bakke is immune from liability because of the statute's plain language. Bakke was participating in a "recreational activity" that includes "physical contact between persons in a sport involving amateur teams[.]"

¶ 14. Wisconsin Stat. § 895.525(4m)(a) provides immunity from negligence actions for participants in a recreational activity that involves physical contact between persons in a sport involving amateur teams. Subsection (4m)(a), Liability of Contact Sports Participants, provides:

> A participant in a recreational activity that includes physical contact between persons in a sport involving amateur teams, including teams in recreational, municipal, high school and college leagues, may be liable for an injury inflicted on another participant during and as part of that sport in a tort action only if the participant who caused the injury acted recklessly or with intent to cause injury.

¶ 15. For those recreational activities that do not involve physical contact, no immunity from negligence actions exists under the statute. *See* Wis. Stat. § 895.525(4). A recreational activity is defined as:

In this section, "recreational activity" means any activity undertaken for the purpose of exercise, relaxation or pleasure, including practice or instruction in any such activity. "Recreational activity" includes hunting, fishing, trapping, camping, bowling, billiards, picnicking, exploring caves, nature study, dancing, bicycling, horseback riding, horseshoe-pitching, bird-watching, motorcycling, operating an all-terrain vehicle, ballooning, curling, throwing darts, hang gliding, hiking, tobogganing, sledding, sleigh riding, snowmobiling, skiing, skating, participation in water sports, weight and fitness training, sight-seeing, rock-climbing, cutting or removing wood, climbing observation towers, animal training, harvesting the products of nature, sport shooting and any other sport, game or educational activity.

Wis. Stat. § 895.525(2).

¶ 16. Therefore, to obtain the benefit of immunity, a defendant must be (1) participating in a recreational activity; (2) that recreational activity must include physical contact between persons; (3) the persons must be participating in a sport; and (4) the sport must involve amateur teams. In this case, there is no dispute that cheerleading is a recreational activity. Noffke asserts that "Bakke's reliance on this statute is misplaced because he and Noffke were not engaged in a *contact sport* involving *competitive teams*." (Emphasis added.) We address Noffke's two arguments regarding contact sports and competition in ¶¶ 24–34.

¶ 17. However, we note here that cheerleading, as discussed in ¶ 32, is a sport because a sport is "[a]n activity involving physical exertion and skill that is

governed by a set of rules or customs;"[3] and cheerleaders are on amateur teams because a team is "[a] group organized to work together"[4] and cheerleaders, as provided in the spirit rules, are a group dedicated to leading fan participation and taking part in competitions.

¶ 18. Accordingly, the central question to be answered in this case is whether cheerleading involves "physical contact between persons." While it is undeniable that cheerleaders touch one another, i.e., they have physical contact with one another during the course of their activity, we utilize a dictionary to guide our interpretation and ensure that we have accurately defined the common, ordinary phrase at issue: "physical contact." *See Swatek v. County of Dane,* 192 Wis. 2d 47, 61, 531 N.W.2d 45 (1995) (stating that this court may consult a dictionary for the common meaning of a word). Reliance on a dictionary, however, does not render a word or phrase ambiguous. *Sample,* 215 Wis. 2d at 499–500.

¶ 19. *The American Heritage Dictionary* is frequently relied upon by courts. *Id.* at 500. It defines "contact" as follows: "1.a. A coming together or touching, as of objects or surfaces. b. The state or condition of touching or of immediate proximity[.]" *The American Heritage Dictionary of the English Language* 406 (3d ed. 1992). The same dictionary defines "physical" as

---

[3] *The American Heritage Dictionary of the English Language* 1742 (3d ed. 1992). While this definition states that a sport is "often undertaken competitively," the definition does not require competition.

[4] *The American Heritage Dictionary of the English Language* 1842 (3d ed. 1992).

follows: "1.a. Of or relating to the body as distinguished from the mind or spirit . . . b. Involving or characterized by vigorous bodily activity: a physical dance performance." *Id.* at 1366 (italics omitted).

¶ 20. As evident from the record, cheerleading involves a significant amount of physical contact between the cheerleaders that at times results in a forceful interaction between the participants. The record contains the 2004–05 spirit rules of the National Federation of State High School Associations. Pages 37 through 62 contain pictures illustrating the spirit rules that govern the various stunts. Every picture but one shows at least two cheerleaders in contact with one another.

¶ 21. The text of the spirit rules also supports the determination that cheerleading involves a significant amount of contact between cheerleaders. For example, rule one, section seven of the definition section describes a "pendulum." A pendulum is "[a] stunt in which the top person in a straight body position falls forward and/or backward away from the base(s) to a horizontal position to catchers while maintaining constant hands-to-feet/legs contact with the base(s)."[5] In the "General Risk Management" section of the spirit rules, rule two, section six, article seven provides that "[d]ismounts from multi-base stunts to a cradle must be cradled by at least two catchers and an additional head and shoulders catcher/spotter."[6]

[5] Physical contact between cheerleaders is also evident from other parts of the definition section: section three entitled "Dismounts," section five entitled "Extended Stunts," section nine entitled "Pyramid (Mount)," section eleven entitled "Suspended Stunts," and section twelve entitled "Pop-Sweep-Toss."

[6] Physical contact between cheerleaders is also evident from other parts of the "General Risk Management" section: section eight entitled "Pendulums/Flatbacks," section nine en-

¶ 22. In addition to the physical contact discussed above, some of the stunts performed by the cheerleaders produce a forceful interaction between the participants. For example, rule two, section 2.12.3, "Tosses," provides four situations where one cheerleader is tossed up into the air and then caught by those same cheerleaders who originally tossed the cheerleader. An illustration of another toss, the "Basket Toss to Original Bases With Spotter" is provided on page 57. This illustration reveals that multiple cheerleaders toss another cheerleader high up into the air—at least a full body length above the catchers' heads—and then catch the cheerleader on the way down.

¶ 23. Accordingly, cheerleading involves a significant amount of contact among the participants that at times can produce a forceful interaction between the cheerleaders when one person is tossed high into the air and then caught by those same tossers. As a result, we conclude that cheerleaders are immune from negligence actions because they participate in a recreational activity that includes physical contact between persons in a sport involving amateur teams.

1. Noffke's argument regarding physical contact

¶ 24. Noffke argues that cheerleading does not give rise to the type of physical contact contemplated by the legislature. Specifically, Noffke asserts that the type of physical contact contemplated by the legislature must be more than the incidental contact that takes place in cheerleading. Noffke relies on the title of subsection (4m) for her argument, which provides: "Liability of contact sports participants." The court of

titled "Pyramids/Mounts," section eleven entitled "Suspended Splits," and section twelve entitled "Tosses."

appeals accepted Noffke's argument and further relied on the dictionary definition of "contact sport." It determined that " 'contact sport' is normally used to describe sports in which opposing players make aggressive and sometimes injury causing contact, such as football and hockey." *Noffke v. Bakke,* 2008 WI App 38, ¶ 16, 308 Wis. 2d 410, 748 N.W.2d 195 (relying on *Webster's New College Dictionary* for a definition of "contact sport"). However, interpreting the statute in this manner is not persuasive for three reasons.

¶ 25. First, reliance on the title for this interpretation is problematic. The "titles to subchapters, sections, subsections, paragraphs and subdivisions of the statutes and history notes are not part of the statutes." Wis. Stat. § 990.001(6). In addition, a title may not be used to alter the meaning of a statute or create an ambiguity where no ambiguity existed. *Estate of Reichenberger v. Binder,* 272 Wis. 176, 179, 74 N.W.2d 740 (1956). Therefore, reliance on the title is not persuasive.

¶ 26. Furthermore, even if we looked to the title, it does not provide clear guidance. The dictionary uses football, hockey, and boxing as examples of contact sports. *See The American Heritage Dictionary of the English Language* 406 (3d ed. 1992). However, subsection (4m)—as both parties and the court of appeals have asserted—was passed in response to *Lestina v. West Bend Mutual Insurance Co.,* 176 Wis. 2d 901, 501 N.W.2d 28 (1993). In *Lestina,* this court concluded that negligence was the appropriate standard of care to govern the conduct of soccer match participants. *Id.* at 903. We doubt the legislature passed a statute in the wake of *Lestina* and then only protected aggressive contact sports such as football, hockey, or boxing.

368

Relying on the title in this case requires this court to make a policy decision that is more appropriately performed by the legislature. Instead, we conclude that the plain language of the statute provides the answer. We give due respect to the legislature's decision to provide immunity to persons who participate in recreational activities that include physical contact between persons in a sport involving amateur teams.

¶ 27. Second, the language of the statute does not restrict its application to only "aggressive" sports such as football, hockey, or boxing. Rather, the statute encompasses any recreational activity that includes physical contact between persons in a sport involving amateur teams. If the legislature intended such a narrow construction, the legislature could have clearly placed such a restriction in the text of the statute.[7]

¶ 28. Third, Noffke's interpretation—that the statute does not apply to "incidental" contact but only to aggressive, competitive contact—would be difficult to apply and creates uncertainty. How much aggressive competitive contact is required for a sport to fall within that interpretation? The purpose behind Wis. Stat. § 895.525, is to decrease uncertainty.

---

[7] *See* 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* (7th ed. 2007) (§ 46:3, " 'Expressed' intent," stating "[w]hat a legislature says in the text of a statute is considered the best evidence of the legislative intent or will"; § 46:6, "Each word given effect," stating "it is also the case that every word excluded from a statute must be presumed to have been excluded for a purpose"; § 47:23, "Expressio unius est exclusio alterius," stating "where a form of conduct, . . . there is an inference that all omissions should be understood as exclusions"; § 47:38, "Insertion of words," stating "[i]n construing a statute, it is always safer not to add to or subtract from the language of a statute unless imperatively required to make it a rational statute").

(1) Legislative purpose. The legislature intends by this section to establish the responsibilities of participants in recreational activities in order to decrease uncertainty regarding the legal responsibility for deaths or injuries that result from participation in recreational activities and thereby to help assure the continued availability in this state of enterprises that offer recreational activities to the public.

Wis. Stat. § 895.525(1).

¶ 29. Unlike Noffke's requirement that a sport must involve a requisite amount of aggressiveness in order to qualify for immunity, the plain meaning of the words chosen by the legislature lends certainty regarding the legal responsibilities and liabilities of those who participate in recreational activities.

2. Noffke's argument that competition is required

¶ 30. Noffke argues that subsection (4m)(a) applies only to *competitive* team sports. In support of this argument, Noffke relies on the portion of subsection (4m)(a) that states, "recreational activity that includes physical contact *between persons in a sport involving amateur teams.*" Wis. Stat. § 895.525(4m)(a) (emphasis added). To not require competition, Noffke argues, would render this portion of the statute superfluous.

¶ 31. We disagree with Noffke's assertions for three reasons. First, no competition requirement exists in the statute. If the legislature sought to require competition, it could have used the word "competition." To assert that such a requirement exists because the word "teams" is plural, elevates one letter in the statute to an absurd importance that would change the entire scope and application of the statute, which seems unlikely because the legislature could have easily used

370

the word "competition" to clearly articulate such a requirement.[8] While the legislature's use of a plural form is generally significant, in this case we decline to conclude that the use of the plural form dictates that the statute requires competition between two teams.

¶ 32. Second, no surplusage exists because the words of the statute are not ignored by our interpretation. Physical contact between persons takes place in cheerleading. Cheerleading is a sport because a sport is "[a]n activity involving physical exertion and skill that is governed by a set of rules or customs,"[9] and construing the word "sport" to exclude cheerleading in this case is inconsistent with the purpose of the statute, which is discussed in ¶ 28.[10] Cheerleaders are on amateur teams because a team is "[a] group organized to work together"[11] and cheerleaders, as provided in the spirit rules, are a group dedicated to leading fan participation and taking part in competitions.

---

[8] In any event, cheerleaders often engage in competition with the opponent's cheerleaders not only during a game but also during organized competitions.

[9] *The American Heritage Dictionary of the English Language* 1742 (3d ed. 1992).

[10] While the question of whether cheerleading is a sport has apparently "been a matter of public debate," the parties in this case focus their arguments on whether cheerleading entails the type of physical contact contemplated by the statute and whether the statute requires competition. If the central issue was that cheerleading is not a sport, there would be no need to devote so much time to "contact." Because of the parties' focus and because construing sport to exclude cheerleading would defeat the purpose of the statute, as shown by its plain language, we conclude that cheerleading is a sport under Wis. Stat. § 895.525(4m)(a).

[11] *The American Heritage Dictionary of the English Language* 1842 (3d ed. 1992).

¶ 33. Third, inserting a competition requirement would produce inconsistent results. For example, assuming that immunity is not afforded because cheerleaders do not compete when cheering at a basketball game, would they then receive immunity, perhaps the very next day, when competing against other teams at a cheerleading competition? Similarly, under Noffke's analysis, when a hockey or football team practices but is not in competition with another team there is no immunity, but when that team plays a game the players receive immunity. Perhaps such inconsistent applications could be why the legislature specifically chose not to insert a competition requirement into this statute.

¶ 34. Accordingly, we conclude that cheerleaders are immune from negligence actions because they participate in a recreational activity that includes physical contact between persons in a sport involving amateur teams. However, we encourage the legislature to once again review this important statute and consider our interpretation and application to the facts of this case and how the statute may apply to such school team sports as golf, swimming, or tennis.

B. Recklessness

¶ 35. The second issue we must address regarding Bakke's liability is whether the circuit court erred when it concluded as a matter of law that Bakke was not reckless. If he was reckless, Bakke is not entitled to immunity under the terms of the statute. Noffke argues that recklessness is a question of fact the jury must resolve, and she argues that in this case Bakke knew he was a spotter responsible for Noffke's safety, Bakke heard others yelling at him to get behind Noffke, and he

failed to take the appropriate position. Bakke, on the other hand, argues that his conduct, which consisted of "mere inadvertence, lack of skillfulness or failure to take precautions," does not rise to the increased level of recklessness. We agree with the circuit court and conclude that the record does not support a claim that Bakke was reckless.

¶ 36. "Recklessness 'contemplates a conscious disregard of an unreasonable and substantial risk of serious bodily harm to another.' " *Werdehoff v. Gen. Star Indem. Co.,* 229 Wis. 2d 489, 507, 600 N.W.2d 214 (Ct. App. 1999) (citing *Kellar v. Lloyd,* 180 Wis. 2d 162, 184, 509 N.W.2d 87 (Ct. App. 1993)). The jury instruction committee provides:

> A participant acts recklessly if (his) (her) conduct is in reckless disregard of the safety of another. It occurs where a participant engages in conduct under circumstances in which (he) (she) knows or a reasonable person under the same circumstances would know that the conduct creates a high risk of physical harm to another and (he) (she) proceeds in conscious disregard of or indifference to that risk. Conduct which creates a high risk of physical harm to another is substantially greater than negligent conduct. Mere inadvertence or lack of skill is not reckless conduct.

Wis JI—Civil 2020.

¶ 37. The circuit court concluded that a finder of fact could not find any evidentiary support "that reflected anything beyond a lack of skill, inadvertence or simple negligence, that this was not a conscious disregard for the safety of the plaintiff." We agree with the circuit court's conclusion. Bakke went in front of the base instead of to the back, and when people yelled at him to get to the back he froze and did not move fast

enough. The record is simply devoid of anything that would indicate that Bakke consciously disregarded the risk of serious bodily harm to Noffke. Therefore, we conclude that the circuit court did not err when it concluded as a matter of law that Bakke was not reckless.

## C. Immunity of the school district

¶ 38. Next, we must determine whether Wis. Stat. § 893.80(4) provides the school district with immunity for the alleged negligent acts of the cheerleading coach. Noffke asserts that the cheerleading coach's cloak of immunity is removed by either of the following exceptions: (1) she violated a ministerial duty imposed by law; and (2) cheerleading involves a known and compelling danger that gives rise to a ministerial duty.

¶ 39. Noffke argues that the cheerleading coach violated a ministerial duty because the coach, as Noffke asserts, did not provide a spotter and mats as required by the spirit rules. In addition, Noffke argues that even if the coach did not violate a ministerial duty imposed by the spirit rules, the coach violated a ministerial duty that arose out of the known and compelling danger of allowing cheerleaders to perform a stunt for the first time without safety precautions. The school district, on the other hand, argues that no ministerial duty was violated because the school board did not officially adopt the spirit rules, the spirit rules were not violated, and no known and compelling danger existed. We conclude that the school district is immune because no ministerial duty imposed by law was violated and there was no known and compelling danger that gave rise to a ministerial duty.

¶ 40. Wisconsin Stat. § 893.80(4) provides:

No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

¶ 41. This statute provides broad immunity from suit to municipalities and their officers and employees. *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 20, 253 Wis. 2d 323, 646 N.W.2d 314. It immunizes against liability for "legislative, quasi-legislative, judicial, and quasi-judicial acts, which have been collectively interpreted to include any act that involves the exercise of discretion and judgment." *Id.*, ¶ 21.

¶ 42. However, no immunity against liability exists for those acts associated with: (1) the performance of ministerial duties imposed by law; (2) known and compelling dangers that give rise to ministerial duties on the part of public officers or employees; (3) acts involving medical discretion; and (4) acts that are malicious, willful, and intentional. *Id.*, ¶ 24. Noffke argues that the first two exceptions apply to the case at hand.

1. Ministerial duty imposed by law

¶ 43. The first exception arises out of. a recognition that discretionary acts are immune whereas ministerial acts are not protected by immunity. *Id.*, ¶ 25. "A ministerial duty is one that 'is absolute, certain and

375

imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.' " *Id.*, ¶ 25 (citing *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976)).

¶ 44. For example, in *Lodl,* the plaintiff asserted that the police officer had a ministerial duty to manually control traffic at an intersection where traffic lights were no longer working. *Lodl,* 253 Wis. 2d 323, ¶¶ 6–8, 27. This court concluded that the applicable statute and the police department's policy did not confer a ministerial duty on the police officer to manually direct traffic. *Id.*, ¶¶ 27–28. The statute at issue did not direct the officer to perform manual traffic control in any specific situation, and the policy only described manual traffic control procedures if the officer decided to manually control traffic. *Id.* Neither the statute nor the policy eliminated the officer's discretion as to when or where to undertake manual traffic control. *Id.*, ¶¶ 28–31.

¶ 45. In the case at hand, the spirit rules do not eliminate the cheerleading coach's discretion. Moreover, the school district did not officially adopt the spirit rules. Nonetheless, Noffke asserts that the spirit rules required the cheerleading coach in this case to provide a spotter and mats. We disagree with Noffke's interpretation. The spirit rules leave a coach's discretion intact; they do not impose the type of ministerial duty that Noffke asserts because the spirit rules lack the absolute, certain, and imperative direction that prescribes and defines the time, mode, and occasion for the action's performance with such certainty that nothing remains for judgment or discretion.

¶ 46. First, the portion of the spirit rules that governs "Coaches' Responsibilities" specifically states:

"The following *guidelines* have been developed and reviewed *to serve as a useful reminder* of basic procedures for coaching spirit squads." (Emphasis added.) In addition, the relevant portions of the "Coaches' Responsibilities" do not confer a ministerial duty upon the coach. Each relevant portion gives the coach discretion. For example, the "Coaches' Responsibilities" provides, "[a]ll spirit activities should be held in a location suitable for spirit activities with the use of mats, free of obstructions, and away from excessive noise or distractions." In addition, the "Coaches' Responsibilities" also provides that "[p]roper progression, spotting techniques and matting should be used until stunts are mastered." Neither of these rules confers an "absolute, certain and imperative" duty upon the coach. Rather, the tone is suggestive, which is evident from the use of language such as "should be" rather than the mandatory word "shall." Moreover, each rule gives the coach discretion as to when and where spotting or matting would be appropriate.

¶ 47. Second, the "General Risk Management" section also fails to confer an "absolute, certain and imperative" duty. Section four, article one of the spirit rules states that "[s]potters are required until a stunt (mount, pyramid, toss, tumbling skill) is mastered," but article six states that "[a] spotter is required for stunts in which the supporting arm(s) of the base(s) is fully extended above the head . . . ." In this case, the post-to-hands stunt does not even require a spotter because the base's hands are not fully extended above the head. In addition, while the cheerleaders in this case had not performed this stunt together, the record reflects that they had performed more difficult stunts, Noffke thought it was a "medium easy" stunt, both Noffke and Bakke thought they could do the stunt, Bakke was a

trained spotter, and the coach knew that "the level of difficulty they were used to was much higher." Therefore, the rules do not clearly mandate that a spotter was necessary, and thus, no ministerial duty imposed by law exists.

¶ 48. However, even if the spirit rules were interpreted as mandating a spotter in this case, the cheerleading coach did provide a spotter—Bakke. The spirit rules define a spotter as "a person who is in direct contact with the performing surface and may help control the building of, or dismounting from, a stunt. This person(s) shall not provide the primary support, meaning the stunt or pyramid would remain stable without the spotter(s)." In this case, Bakke was on the ground, he assisted in the building of the post-to-hands, and the stunt could remain stable without Bakke. Bakke was not the base, but rather, he served as the spotter to the stunt even though that stunt did not require a spotter.

¶ 49. Noffke argues that the rules impose a ministerial duty upon the coach to make sure the spotter is in the right position in order to be considered a spotter. However, we do not interpret this provision as conferring an "absolute, certain and imperative" duty on the coach. While it is true that Bakke should have been standing in the back instead of the front, he was there as a spotter. Only two persons are required for this stunt, but the coach, as a safety precaution, required an extra person to be present and serve as an extra spotter.

¶ 50. Noffke also argues that the cheerleading coach violated a ministerial duty by failing to provide matting as required by the rules. We, however, disagree because any matting provision in the rule gives the cheerleading coach discretion and thus does not confer a ministerial duty. The comment to rule two, situation

378

ruling 2.1.4, situation B, provides that "[s]tunting should be performed only on appropriate surfaces where there is adequate space and lighting." As stated above, the "Coaches' Responsibilities" provides, "[a]ll spirit activities should be held in a location suitable for spirit activities with the use of mats, free of obstructions, and away from excessive noise or distractions." We do not interpret these provisions to prescribe and define the time, mode, and occasion for matting with such certainty that nothing remains for judgment or discretion. In fact, these stunts would ultimately be performed without mats during a basketball game.

¶ 51. Accordingly, we conclude that the spirit rules provide the cheerleading coach with a significant amount of discretion. The spirit rules provide discretion rather than conferring any absolute, certain, imperative, and therefore ministerial duty.

2. Ministerial duty arising out of a known and compelling danger

¶ 52. Noffke also argues that cheerleading, under the facts of this case, is a known and compelling danger that gives rise to a ministerial duty. This exception to immunity arises out of the theory that a known and compelling danger may be so dangerous that a public officer has a duty to act. *Lodl*, 253 Wis. 2d 323, ¶¶ 33–34; *Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis. 2d 81, 95–96, 596 N.W.2d 417 (1999).

> [A] public officer's duty is ministerial where a danger is known and of such quality that the public officer's duty to act becomes absolute, certain and imperative . . . . Stated otherwise, where a public officer's duty is not generally prescribed and defined by law in time, mode,

and occasion, such that nothing remains for judgment or discretion, circumstances may give rise to such a certain duty where . . . the nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act. . . .

*Lodl,* 253 Wis. 2d 323, ¶ 34 (quotations and citations omitted).

¶ 53. This exception arose out of *Cords v. Anderson,* 80 Wis. 2d 525, 259 N.W.2d 672 (1977). In *Cords,* the plaintiffs fell into a steep, 90–feet-deep gorge while walking on a state park trail, which did not have any warning signs. *Id.* at 534–35, 541–42. The plaintiffs sued the park manager for failing to post warning signs even though he knew of the hazard. This court concluded that the known and compelling danger gave rise to a ministerial duty requiring the manager to post warning signs or advise his superiors of the hazardous condition. *Id.* at 541–42. A ministerial duty arose because the danger was so clear and so absolute. *Id.* at 542.

¶ 54. The court of appeals most recently applied the known and compelling danger exception in *Voss v. Elkhorn Area School District,* 2006 WI App 234, 297 Wis. 2d 389, 724 N.W.2d 420. In *Voss,* students were learning about the effects of alcohol by wearing "fatal vision goggles." *Id.,* ¶ 2. When the goggles are worn, the situation is meant to replicate a .10 blood alcohol concentration. *Id.* While wearing the goggles, the teacher had students perform exercises such as walking in a straight line, shooting a ball at a garbage can, and standing on one leg. *Id.,* ¶ 3. While participating in these exercises some of the students lost their balance, slipped or stumbled. *Id.* In addition to the above exercises, the teacher also arranged the classroom desks into three rows and instructed students to walk in

between the rows and recover a tennis ball thrown by the teacher. *Id.*, ¶ 4. During this particular exercise, some of the students collided and slid on the floor. *Id.*, ¶ 6. Even after these initial problems, the exercise continued and one of the students tripped and hit her mouth on a desktop. *Id.* As a result of her injuries, the student lost one tooth, fractured others, and ultimately had to have multiple root canals and crown work done on her teeth. *Id.*, ¶¶ 7–9.

¶ 55. The court of appeals concluded that the known and compelling danger exception applied and thus precluded immunity. *Id.*, ¶ 20. The court of appeals reasoned that despite the obvious hazards and knowledge of previous students falling, the teacher continued the exercise and took no precautions to minimize or prevent injury. *Id.*, ¶ 19. Additionally, the court of appeals reasoned that in *Voss,* the teacher had only one reasonable choice to prevent or minimize danger, which was to stop the activity. *Id.*, ¶ 20. The court of appeals contrasted the teacher's choice with the scenario that the police officer faced in *Lodl.* Recall that in *Lodl,* the police officer was called out to an intersection where traffic lights were no longer working. *Lodl,* 253 Wis. 2d 323, ¶¶ 6–8. This court concluded that "[w]hile the circumstances posed by the uncontrolled intersection were certainly known and dangerous, the situation nonetheless allowed for the exercise of the officer's discretion as to the mode of response." *Id.*, ¶ 46. As a result, the police officer did not have a ministerial duty to perform manual traffic control. *Id.* Rather, he could have chosen to control traffic with portable signs, flares, or flashing squad lights. *Id.*, ¶ 47.

¶ 56. In the case at hand, the danger does not give rise to a ministerial duty because there is no known and

compelling danger of such force that the time, mode, and occasion for performance is evident with such certainty that nothing remains for the exercise of discretion. Noffke and Bakke were performing a stunt that was less difficult than what they had performed in the past. Bakke was a trained spotter. Noffke and Bakke thought they could safely perform the stunt. Unlike in *Cords* where the situation was so compellingly dangerous and known that the park manager had no choice but to put up a sign or warn his superiors, the danger in the case at hand was not so compellingly dangerous as to remove all discretion. Moreover, unlike in *Voss* where only one action could have been taken, the cheerleading coach in this case had a wide range of acts that could have been used to prevent injury. In fact, the coach did exercise her discretion and provided a spotter in order to help prevent injury.

¶ 57. Again, Noffke argues that the coach did not act appropriately because she did not provide mats even though Bakke and Noffke had never before performed the stunt together. This assertion, however, sets forth a negligence argument rather than an argument that the danger gave rise to a ministerial duty. The immunity defense assumes negligence. *Lodl,* 253 Wis. 2d 323, ¶ 17. While arguably mats should be provided when cheerleaders are attempting any stunt for the first time, this is not relevant to our known and compelling danger analysis. As discussed before, mats were not a requirement. Here, the danger was not so known and compelling that the coach had no choice and no discretion but to provide mats for the cheerleaders.

### V. CONCLUSION

¶ 58. Accordingly, we conclude that (1) pursuant to Wis. Stat. § 895.525(4m)(a), Bakke is immune from liability because he was participating in a recreational

activity that includes physical contact between persons in a sport involving amateur teams; (2) the circuit court did not err when it concluded as a matter of law that Bakke was not reckless; and (3) the school district is immune because no ministerial duty was violated by the cheerleading coach and there was no known and compelling danger that gave rise to a ministerial duty.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

¶ 59. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I concur in the court's mandate but write separately to set forth a different analysis of the question whether cheerleading is a "sport involving amateur teams" for purposes of Wis. Stat. § 895.525(4m)(a).

¶ 60. The majority opinion resolves this vexing issue of statutory interpretation in one short paragraph, relying on dictionary definitions of the key statutory words "sport" and "teams."[1] Dictionaries may aid the court in determining the meaning of statutory words. But they do not in the present case. Dictionaries usually furnish more than one meaning to a word, and a court has to be careful not to select a friendly definition it likes from the many offered without explaining its choice. Thus resort to a dictionary can be, as Justice Scalia has written of the use of legislative history, "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends."[2]

¶ 61. The dictionary definitions of "sport" and "teams" do not demonstrate whether cheerleading is "a sport involving amateur teams" for purposes of Wis. Stat. § 895.525(4m). The dictionaries suggest that the

[1] *See* majority op., ¶ 17.

[2] *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring).

words "sport" and "team" each connote an element of competition that may or may not be present in cheerleading. "Sport" is defined as "[a]n activity involving physical exertion and skill that is governed by a set of rules or customs and often undertaken competitively"[3] or as "a game or contest esp. when involving individual skill or physical prowess on which money is staked."[4] "Team" is defined as "[a] group on the same side, as in a game,"[5] or as "a number of persons selected to contend on one side in a match (as in cricket, football, rowing, or a debate)."[6] These definitions plainly suggest that team sports involve competition.

¶ 62. Connoting competition, the definitions of "sport" and "team" yield equivocal results when applied to an activity such as cheerleading. Although organized cheerleading competitions do exist,[7] cheerleaders tradi-

---

[3] *American Heritage Dictionary of the English Language* 1742 (3d ed. 1992) [hereinafter *American Heritage*].

[4] *Webster's Third New International Dictionary* 2206 (1961) [hereinafter *Webster's*].

[5] *American Heritage, supra* note 3, at 1842. *American Heritage* denotes this particular definition of "team" as applicable in the context of "*Sports & Games.*" *Id.* This sports-specific definition of "team" is the most relevant definition for purposes of Wis. Stat. § 895.525(4m), which refers specifically to sports teams and not to teams generally.

Inexplicably, the majority opinion skips over *American Heritage*'s sports-specific definition of "team" in favor of an alternative definition that obviously is meant to apply in broader contexts: "a group organized to work together: *a team of engineers.*" *Id.* (italics in original). *See also* majority op., ¶ 17 (quoting this definition in part).

[6] *Webster's, supra* note 4, at 2346.

[7] *See* World Cheerleading Association, *2007–2008 WCA National Champions,* at http://www.cheerwca.com/ 2007– champions -results.htm (last visited Jan. 20, 2009).

tionally have not participated in organized competition and now do so only sometimes. Indeed, the cheerleading squad at issue in the present case apparently did not participate in any organized cheerleading competitions.[8] Consequently, it is unclear whether cheerleading is "often undertaken competitively"[9] or constitutes "a game or contest."[10] Nor is it clear whether a cheerleading squad may be considered "[a] group on the same side, as in a game,"[11] or "a number of persons selected to contend on one side in a match."[12]

¶ 63. This court ordinarily gives statutory language "its 'common, ordinary, and accepted meaning.' "[13] The dictionary definitions of "sport" and "team" do not demonstrate whether it is the common, ordinary, and accepted practice to regard cheerleading as a "sport involving amateur teams." At best, the dictionaries demonstrate only that the statutory words "sport" and "team" *can be* used in reference to cheerleading and

[8] *See* majority op., ¶ 3 (stating only that Noffke was a varsity basketball cheerleader; not mentioning any sort of organized cheerleading competitions).

[9] *American Heritage, supra* note 3, at 1742.

[10] *Webster's, supra* note 4, at 2206.

[11] *American Heritage, supra* note 3, at 1842.

Although a cheerleading squad obviously represents "a group on the same side," it is uncertain whether a cheerleading squad is "in a game" any more than the fans are. The squad in the present case cheers at high school basketball games. It could reasonably be stated that these basketball games involve only two teams (the ones that play basketball), not four teams as the defendants might appear to argue.

[12] *Webster's, supra* note 4, at 2346.

[13] Majority op., ¶ 10 (quoting *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110.

385

cheerleading squads, not that it is the common, ordinary, and accepted practice to use these words in such a manner. As Justice Scalia has written, a court must not overlook "the distinction between how a word *can be* used and how it *ordinarily is* used" when interpreting statutory text.[14]

¶ 64. It is hardly surprising that the dictionaries do not definitively determine whether cheerleading constitutes a "sport involving amateur teams." Whether cheerleading should be considered a team sport has been a matter of public debate. Just this last September, a Washington Post article stated that "cheerleading is not officially considered a sport at most high schools and universities" and that "cheerleading in most states is not considered a sport; it's an 'activity' such as chess club and debating."[15] It would be very odd if the high schools, universities, and states that do not consider cheerleading a sport could discover the error of their ways simply by consulting a dictionary.

¶ 65. As I see this case, the statute's phrase "a sport involving amateur teams" must be interpreted in light of the legislature's express purpose of "decreas-[ing] uncertainty regarding the legal responsibility for deaths or injuries that result from participation in recreational activities and thereby to help assure the continued availability in this state of enterprises that offer recreational activities to the public."[16]

---

[14] *Smith v. United States,* 508 U.S. 223, 242 (1993) (Scalia, J., dissenting) (emphasis in original).

[15] *Rooting for Safety,* Washington Post, Sept. 9, 2008, at HE01.

[16] Wis. Stat. § 895.525(1).

*See also Racine Harley-Davidson, Inc. v. State Div. of Hearings & Appeals,* 2006 WI 86, ¶ 92, 292 Wis. 2d 549, 717

¶ 66. The application of Wis. Stat. § 895.525(4m) would be fraught with uncertainty if competition were taken to be the essence of a "sport involving amateur teams" under the statute. As the majority opinion points out,[17] a cheerleading squad may cheer at a basketball game one day but then compete in an organized cheerleading contest the next. The statute's purpose of decreasing uncertainty would not be furthered if the statutory phrase "sport involving amateur teams" imposed a requirement of competition on cheerleading limiting the scope of Wis. Stat. § 895.525(4m).

¶ 67. Accordingly, because cheerleading can be construed as "a sport involving amateur teams" and such construction furthers the purpose of Wis. Stat. § 895.525, I conclude that Wis. Stat. § 895.525(4m)(a) covers high school cheerleaders. For the reasons set forth, I write separately.

¶ 68. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

N.W.2d 184 (2006) (construing the statute's terms to be consistent with its express purpose); *State v. Hayes,* 2004 WI 80, ¶ 39, 273 Wis. 2d 1, 681 N.W.2d 203 (2004) ("We therefore turn to an analysis of the purpose[] . . . of the statute to determine the interpretation that gives the statute its intended effect.").

[17] Majority op., ¶ 33.