**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cleveland v. State,* **Slip Opinion No. 2019-Ohio-3820.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-3820

THE CITY OF CLEVELAND, APPELLEE, *v.* THE STATE OF OHIO, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cleveland v. State,* **Slip Opinion No. 2019-Ohio-3820.]**

*Municipalities—Required contract terms concerning hiring city residents—R.C. 9.75—Statute forbidding public authority from requiring contractors to employ public authority's residents overrides local legislation imposing such requirements—Statute enacted pursuant to authority granted by Article II, Section 34, Ohio Constitution.*

(No. 2018-0097—Submitted March 6, 2019—Decided September 24, 2019.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 105500, 2017-Ohio-8882.

_____

**KENNEDY, J.**

{¶ 1} In this discretionary appeal from a judgment of the Eighth District Court of Appeals, we consider whether the enactment of R.C. 9.75, which prohibits a public authority from requiring that contractors on public-improvement projects employ a specific number or percentage of the public authority's residents, is within

the power granted to the General Assembly by Article II, Section 34 of the Ohio Constitution. That constitutional provision affords the legislature the authority to enact laws "providing for the comfort, health, safety and general welfare of all employes."

{¶ 2} The appellate court affirmed the trial court's order permanently enjoining enforcement of R.C. 9.75 and held that Article II, Section 34 did not authorize the General Assembly to infringe on appellee city of Cleveland's municipal home-rule authority under Article XVIII, Section 3 of the Ohio Constitution ("Home Rule Amendment") to impose city-residency preferences in Cleveland's public-improvement contracts.

{¶ 3} We reject that analysis. Article II, Section 34 of the Ohio Constitution is a broad grant of authority to the General Assembly to legislate for the welfare of the working people in Ohio. The legislature exercised that authority in enacting R.C. 9.75, which protects all employees engaged in the construction trades from public-improvement contracts that impose conditions on employment favoring a public authority's own residents to the detriment of other construction workers in the state. Because every resident of a political subdivision is affected by the residency restrictions imposed by another political subdivision, the statute provides for the comfort and general welfare of all Ohio construction employees and therefore supersedes conflicting local ordinances.

{¶ 4} Accordingly, we reverse the judgment of the court of appeals and remand this matter to the trial court to dissolve the injunction and enter judgment in favor of appellant, the state of Ohio.

**Facts and Procedural History**

{¶ 5} In 2003, the Cleveland City Council found that few of the employment opportunities created by the city's expenditures for public improvements were going to city residents. Seeking to help alleviate unemployment and poverty in Cleveland, the city council enacted the Fannie M.

2

Lewis Cleveland Resident Employment Law, Cleveland Codified Ordinances Chapter 188.

{¶ 6} The Fannie Lewis Law requires public-construction contracts in an amount of $100,000 or more to include a provision mandating that city residents perform 20 percent of the total construction work hours under the contract. Cleveland Codified Ordinances 188.01(b), 188.02(a)(1). It also requires the construction contract to specify penalties for a contractor's failure to comply with this contractual term. Cleveland Codified Ordinances 188.02(a)(2), 188.05. Those penalties include damages of up to 2.5 percent of the final total amount of the contract as well as the possibility of the city withholding payments, terminating the contract, or disqualifying the contractor from future bids. Cleveland Codified Ordinances 188.05(b), 188.05(c).

{¶ 7} In 2016, the General Assembly enacted what is now R.C. 9.75 (originally enacted as R.C. 9.49, 2016 H.B. No. 180), which provides:

> (B)(1) No public authority shall require a contractor, as part of a prequalification process or for the construction of a specific public improvement or the provision of professional design services for that public improvement, to employ as laborers a certain number or percentage of individuals who reside within the defined geographic area or service area of the public authority.
>
> (2) No public authority shall provide a bid award bonus or preference to a contractor as an incentive to employ as laborers a certain number or percentage of individuals who reside within the defined geographic area or service area of the public authority.

R.C. 9.75(A)(6) defines "public authority" to include municipalities such as the city of Cleveland and other political subdivisions of the state. The statute also states

that a "public improvement" includes "[a]ny structure or work constructed by a public authority or by another person on behalf of a public authority pursuant to a contract with the public authority." R.C. 9.75(A)(7)(d).

{¶ 8} In uncodified language, the General Assembly recognized "[t]he inalienable and fundamental right of an individual to choose where to live," 2016 H.B. No. 180, Section 3(A), and found that "it is a matter of statewide concern to generally allow the employees working on Ohio's public improvement projects to choose where to live," *id*. at Section 4. It declared its intent "to provide for the comfort, health, safety, and general welfare of those employees" by enacting legislation to "prohibit public authorities from requiring contractors, as a condition of accepting contracts for public improvement projects, to employ a certain number or percentage of individuals who reside in any specific area of the state." *Id*.

{¶ 9} The city of Cleveland brought this action seeking a temporary restraining order, injunctive relief, and a judgment declaring R.C. 9.75 to be unconstitutional because it conflicts with the city's home-rule authority. It also sought a declaration that "the General Assembly's reference to Article II Section 34 of the Ohio Constitution as a justification for enacting [R.C. 9.75] is improper, not well taken, and unconstitutional."

{¶ 10} The trial court permanently enjoined enforcement of R.C. 9.75. It found that R.C. 9.75 "does not provide for the comfort, health, safety, and welfare of employees; rather, [it] seeks only to dictate the terms by which municipalities may contract for workers in construction projects within their realm." It therefore determined that the statute exceeds the authority afforded the legislature by Article II, Section 34. Moreover, the court concluded that R.C. 9.75 violates the Home Rule Amendment, Article XVIII, Section 3 of the Ohio Constitution because the statute limits the city's exercise of local self-government. And the court, assuming for the sake of argument that the ordinance was an exercise of the city's police

4

power, declared that R.C. 9.75 is not a general law and therefore must yield to the city's home-rule authority.

{¶ 11} The Eighth District Court of Appeals affirmed, holding that "R.C. 9.75 does not relate to the right of an individual to choose where to live or a matter implicating the general welfare of all employees." 2017-Ohio-8882, 90 N.E.3d 979, ¶ 24. The appellate court explained that the statute is not an exercise of the General Assembly's authority granted by Article II, Section 34 of the Ohio Constitution, *id.* at ¶ 26, concluding that "[i]t is readily apparent that R.C. 9.75 is no more than an attempt to preempt powers of local self-government and to restrict the contract terms between public authorities and contractors who choose to bid on local public improvement contracts," *id*. at ¶ 25. The court further determined that the Fannie Lewis Law constitutes an exercise of local self-government by providing contract terms for the city's public-improvement contracts. *Id*. at ¶ 35. The appellate court further explained that R.C. 9.75 is not a general law that supersedes conflicting ordinances, because it is not part of a statewide and comprehensive scheme, *id*. at ¶ 41, it only serves to limit the legislative power of a municipal corporation, *id*. at ¶ 42, and it does not prescribe a rule of conduct upon citizens generally, *id*. at ¶ 43.

### Positions of the Parties

{¶ 12} On appeal to this court, the state contends that the General Assembly exercised the power granted by Article II, Section 34 of the Ohio Constitution to pass laws for employees' comfort and general welfare when it enacted R.C. 9.75. Relying on *Lima v. State*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, the state maintains that the statute protects employees from a city's preference for its own residents and ensures that all employees are free to decide where to live without sacrificing the opportunity to compete for work in other parts of the state. Because R.C. 9.75 benefits construction workers across Ohio, the state explains, it provides for the general welfare of employees. Therefore, pursuant to Article II,

Section 34, the statute prevails over an ordinance enacted pursuant to a municipality's home-rule authority. But in any case, the state argues that R.C. 9.75 does not violate the Home Rule Amendment, because the statute is a general law that supersedes conflicting municipal ordinances such as the Fannie Lewis Law.

{¶ 13} The city asserts that R.C. 9.75 does not provide for the comfort and general welfare of all employees, because the Fannie Lewis Law does not regulate the residency of anyone but rather provides only contractual terms between the city and its contractors relating to how the city will spend its own money. It notes that this court's cases upholding legislation enacted pursuant to Article II, Section 34, including *Lima*, "involve statutory impacts on direct employer-employee relationships," while "R.C. 9.75 does not address an employer-employee relationship, but rather the arms-length relationship between municipalities and contractors in negotiating public contracts." Lastly, the city contends that R.C. 9.75 violates the Home Rule Amendment, because providing the terms on which the city will contract for public improvements is the exercise of local self-government, and the statute cannot displace the ordinance because it is not a general law—it is not part of a statewide and comprehensive plan, it improperly attempts to limit local self-government, and it does not prescribe a rule of conduct upon citizens generally.

{¶ 14} We accepted two propositions of law for review:

> (I) R.C. 9.75 is a valid exercise of authority under Article II, Section 34, because it provides for the general welfare of employees by protecting them from local preferences. Thus, no home-rule analysis is needed.
>
> (II) R.C. 9.75 satisfies home rule. Cleveland's ordinance is an exercise of police power designed to serve general-welfare interests by shifting work to local residents. The challenged law is a general law that counteracts the significant extraterritorial effects

6

residency quotas have on Ohioans living outside the relevant local jurisdiction.

Our resolution of the first proposition of law makes it unnecessary to decide the second, and we decline to do so.

## Law and Analysis

### *Standard of Review*

{¶ 15} A statute cannot be enjoined unless it is unconstitutional. *Toledo v. State,* 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 17. The power to enjoin a statute is "further 'circumscribed by the rule[s] that laws are entitled to a strong presumption of constitutionality and that a party challenging the constitutionality of a law bears the burden of proving that the law is unconstitutional beyond a reasonable doubt.' " (Brackets added in *Toledo*.) *Id.* at ¶ 18, quoting *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16. The determination whether a statute or ordinance is constitutional is a question of law that we review de novo. *Crutchfield Corp. v. Testa*, 151 Ohio St.3d 278, 2016-Ohio-7760, 88 N.E.3d 900, ¶ 16; *Toledo, Columbus & Ohio River RR. Co. v. Miller*, 108 Ohio St. 388, 140 N.E. 617, paragraph two of the syllabus (1923).

### *Constitutional Construction*

{¶ 16} The purpose of our written constitution is to define and limit the powers of government and secure the rights of the people. It controls as written unless changed by the people themselves through the amendment procedures established by Article XVI of the Ohio Constitution. The Ohio Constitution is the paramount law of this state, and we recognize that the framers chose its language carefully and deliberately, employed words in their natural sense, and intended what they said, *see Gibbons v. Ogden*, 22 U.S. 1, 188, 6 L.Ed. 23 (1824), *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So.2d 503, 510 (Fla.2008).

**{¶ 17}** Therefore, in construing the Ohio Constitution, our duty is to determine and give effect to the intent of the framers as expressed in its plain language, *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 50, so that " '[w]here the meaning of a provision is clear on its face, we will not look beyond the provision in an attempt to divine what the drafters intended it to mean.' " *Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16, quoting *State ex rel. Maurer v. Sheward,* 71 Ohio St.3d 513, 520-521, 644 N.E.2d 369 (1994). We give undefined words in the Constitution their usual, normal, or customary meaning, *Toledo City School Dist.* at ¶ 16*,* and we may go beyond the text to consider other sources of meaning, such as the purpose of an amendment, the history of its adoption, or its attending circumstances, only "when the language being construed is 'obscure or of doubtful meaning,' " *State ex rel. Wallace v. Celina*, 29 Ohio St.2d 109, 112, 279 N.E.2d 866 (1972), quoting *Cleveland v. Bd. of Tax Appeals*, 153 Ohio St. 97, 103, 91 N.E.2d 480 (1950). *See Maurer* at 522 ("we will not look to the history of a provision where, as here, the language of the provision is clear"). We may not use canons of interpretation to create ambiguity that does not exist in the plain language itself. *See State v. Krutz*, 28 Ohio St.3d 36, 37, 502 N.E.2d 210 (1986); *Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 227, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). Doing so would be inconsistent with "the well-established rule that the plain language of the enacted text is the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993).

*Article II, Section 34*

**{¶ 18}** Because the General Assembly is vested with the legislative power of this state, it may enact any law that is not in conflict with the Ohio or United States Constitutions. *Toledo*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, at ¶ 17. Additionally, Article II, Section 34 of the Ohio Constitution

provides: "Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power."

{¶ 19} What is now Article II, Section 34 was initially introduced as Proposal No. 122, relating "to employment of women, children and persons engaged in hazardous employment." 1 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 106 (1912). *See generally Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 14-15, 539 N.E.2d 103 (1989) (providing a history of the debates regarding Article II, Section 34). On being reported out of the committee on labor, the amended proposal addressed "all employes." 1 *Proceedings and Debates* at 755. The convention adopted Proposal No. 122, more broadly titled "Welfare of employees," by a vote of 96 yeas and 5 nays. 2 *Proceedings and Debates* at 1786. Following its approval by the people of Ohio, the legislative authority to address the welfare of Ohio's working people is now enshrined in our Constitution as Article II, Section 34.

{¶ 20} We have described the language used in Section 34 as "so clear and unequivocal that resort to secondary sources, such as the constitutional debates, is actually unnecessary. * * * [I]t is the duty of courts to enforce the provision as written." *Rocky River* at 15.

{¶ 21} In giving undefined words in the Constitution their usual, normal, or customary meaning, we rely on their dictionary definitions. *E.g.*, *State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, ¶ 12; *State ex rel. King v. Summit Cty. Council*, 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, ¶ 35-36; *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic*, 62 Ohio St.3d 297, 300-301, 581 N.E.2d 1086 (1991); *State ex rel. Saxbe v. Brand*, 176 Ohio St. 44, 46-47, 197 N.E.2d 328 (1964); *accord People v. Rea*, 500 Mich. 422, 428, 902 N.W.2d 362 (2017); *Venice HMA, L.L.C. v. Sarasota Cty.*, 228 So.3d 76, 81 (Fla.2017);

*Noffke ex rel. Swenson v. Bakke*, 315 Wis.2d 350, 2009 WI 10, 760 N.W.2d 156, ¶ 10.

{¶ 22} The 1911 edition of *Webster's New International Dictionary* (1911) defines "comfort" to mean "[s]trengthening aid," "[a]ssistance; relief: succor; support," and "[s]tate or feeling of having relief, cheer, or consolation; specif., contented enjoyment in physical well-being, free from want or anxiety; mental ease or satisfaction or material well-being; freedom from pain, want, or anxiety." *Id.* at 446. The same dictionary defines "welfare" as "[s]tate of faring, or doing, well; state or condition in regard to well-being; esp., condition of health, happiness, prosperity, or the like * * *." These meanings persist today. *See Webster's Third New International Dictionary* 454, 2594 (2002) (defining "comfort" and "welfare").

{¶ 23} The authority vested in the General Assembly by Article II, Section 34 to pass laws advancing employees' comfort and general welfare therefore includes laws providing for the assistance, support, well-being, and prosperity of Ohio's working people. Because the language of Section 34 is plain and unambiguous, we may not resort to other forms of constitutional interpretation—arguments concerning the structure of the Constitution, canons of construction such as the doctrine of ejusdem generis and the rule against superfluities, and the historical record available—that are used when a provision's meaning is unclear.

{¶ 24} We reject the contention that authority to provide for the comfort and general welfare of employees is limited to regulating the workplace environment or workplace conditions and hazards. We must give effect to the broader language the framers used, not narrow it under the guise of constitutional construction. And tellingly, it has long been recognized that a constitutional grant of authority to provide for the "general welfare" represents a broad grant of discretion to the legislature. *See, e.g., Agency for Internatl. Dev. v. Alliance for Open Soc. Internatl., Inc.*, 570 U.S. 205, 213, 133 S.Ct. 2321, 186 L.Ed.2d 398 (2013) (explaining that

the United States Constitution's Spending Clause "provides Congress broad discretion to tax and spend for the 'general Welfare' "); *New York v. United States*, 505 U.S. 144, 158, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (noting the court's "broad construction" of Congress' power to spend for "the general Welfare"); *South Dakota v. Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) ("In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress").

{¶ 25} We understand that the authority to legislate for the comfort and general welfare of employees may overlap with other powers granted to the General Assembly in Section 34 and elsewhere in the Constitution. That does not render those other provisions meaningless. Instead, the words the framers deliberately chose remove any doubt that in addition to providing for employees' comfort and general welfare, the General Assembly also has the specific authority to pass laws regulating wages, hours, health, and safety—as well as to create a workers' compensation scheme (which relates to employee health, hours, and wages) and to set hours for work on public-work projects (which implicates the authority to fix and regulate the hours of labor). *See Ali*, 552 U.S. at 226, 128 S.Ct. 831, 169 L.Ed.2d 680 (unnecessary examples may be inserted out of an abundance of caution).

{¶ 26} We also recognize that the plain meaning of Section 34 permits the General Assembly to advance the general welfare of employees notwithstanding other protections secured by the Bill of Rights or the Home Rule Amendment. Section 34 states that "no other provision of the constitution shall impair or limit this power." The framers were aware of the Bill of Rights, which predated the 1912 Constitution, as well as the home-rule provisions adopted at the 1912 convention, yet they nonetheless decided that the powers granted in Section 34 would override those other provisions. "[W]e must not ignore the words of our Constitution * * * in order to reach a result which we believe to be desirable in this particular case.

Our function is to interpret those words and not to revise them." *Johnson v. Indus. Comm.*, 164 Ohio St. 297, 302, 130 N.E.2d 807 (1955).

*Caselaw Construing Article II, Section 34*

{¶ 27} In more than a century since the adoption of Section 34, we have never suggested that its language is somehow ambiguous, unclear, or limited. Rather, we have explained that Article II, Section 34 of the Ohio Constitution is "a broad *grant* of authority to the General Assembly" to fix the hours of labor, establish a minimum wage, and provide for the comfort, health, safety, and general welfare of all employees. (Emphasis sic.) *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 61, 717 N.E.2d 286 (1999).

{¶ 28} Based on this constitutional grant of authority, we have upheld statutes that limited the number of consecutive hours that city firefighters could work, *State ex rel. Strain v. Houston*, 138 Ohio St. 203, 210, 34 N.E.2d 219 (1941), compelled employers and employees to respect a day of rest through Sunday closing laws, *State v. Kidd*, 167 Ohio St. 521, 527, 150 N.E.2d 413 (1958), and increased teaching hours at state universities, *Am. Assn. of Univ. Professors* at 61.

{¶ 29} We have also sustained laws that regulate the conditions of employment, including what minimum wage will be paid, *Strain v. Southerton*, 148 Ohio St. 153, 74 N.E.2d 69 (1947), what safety equipment must be used, *Akron & Barberton Belt RR. Co. v. Pub. Util. Comm.*, 148 Ohio St. 282, 286, 74 N.E.2d 256 (1947) (cabooses), and what benefits the employee will receive, *State ex rel. Bd. of Trustees of Police & Firemen's Pension Fund v. Bd. of Trustees of Police Relief & Pension Fund of Martins Ferry*, 12 Ohio St.2d 105, 107, 233 N.E.2d 135 (1967) (state police and firefighter disability and pension fund); *State ex rel. Mun. Constr. Equip. Operators' Labor Council v. Cleveland*, 114 Ohio St.3d 183, 2007-Ohio-3831, 870 N.E.2d 1174, ¶ 78 (statutory sick-leave benefits).

{¶ 30} In addition, we have validated enactments seeking to advance the comfort and general welfare of employees. In *Rocky River*, we upheld the Ohio Public Employees' Collective Bargaining Act's requirement for binding arbitration as "indisputably concerned with the 'general welfare' of employees." 43 Ohio St.3d at 13, 539 N.E.2d 103. And in *Lima*, we let stand a statute forbidding political subdivisions from imposing residency requirements on their employees, stating that the statute "provides for the comfort and general welfare of public employees by ensuring that they will be able to choose the municipality in which they reside." 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, at ¶ 1, 14.

{¶ 31} And this court has consistently recognized that if a statute is enacted pursuant to Article II, Section 34, then it is not limited by the Home Rule Amendment's reservation of all powers of local self-government to municipalities. *E.g., Lima* at ¶ 1; *Mun. Constr. Equip. Operators' Labor Council v. Cleveland* at ¶ 78; *Rocky River* at paragraph two of the syllabus.

*R.C. 9.75 and the Fannie Lewis Law*

{¶ 32} R.C. 9.75 prohibits municipalities such as the city of Cleveland from requiring contractors to employ local residents on public-improvement projects. It conflicts with Cleveland's Fannie Lewis Law, which requires contractors on the city's public-improvement projects to set aside a minimum amount of work for Cleveland's residents.

{¶ 33} The Ohio Constitution entrusts the General Assembly with the power to pass laws fixing the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety, and general welfare of all employees. Necessarily within that power is the authority to regulate public-improvement contracts that impose terms directly affecting the employment of Ohio workers, including city-specific requirements for hours of work, minimum wages, or health and safety protections. And Section 34 also authorizes the General Assembly to

pass laws regulating public-improvement contracts when necessary to provide for the comfort and general welfare of Ohio employees.

{¶ 34} Contrary to the appellate court's conclusion, the General Assembly has not acted only to restrict the city of Cleveland's powers of local self-government over contracting. The Fannie Lewis Law does not simply set forth commercial terms on which the city is willing to bargain with contractors. Rather, the ordinance regulates the employment of workers hired under public-works contracts by requiring those contracts to exact binding promises dictating the *eligibility* of a worker to be hired on a construction project. By reserving work for Cleveland's residents, the Fannie Lewis Law directly impacts hiring, the most basic condition of employment, for workers on public-improvement projects. In doing so, the city of Cleveland has legislated within a field subject to regulation by the General Assembly pursuant to Article II, Section 34.

{¶ 35} Further, R.C. 9.75 provides for the assistance, support, well-being, and prosperity of construction workers across this state when it prohibits terms in a city's public-improvement contracts that disqualify workers based solely on their residency. *See Lima*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, at ¶ 14. Protectionist city-residency regulations affect all Ohio construction workers, because every resident of a political subdivision is disfavored by the residency restrictions imposed by another political subdivision. For example, Cleveland residents are disadvantaged by Akron's local hiring policy just as Akron residents are disadvantaged by the Fannie Lewis Law. *See Ohio Contrs. Assn. v. Akron*, N.D.Ohio No. 5:14CV0923, 2014 WL 1761611 (May 1, 2014), *1-2 (discussing Akron's local hiring policy). By providing an equal opportunity for Ohioans to compete for work on public-improvement projects both inside and outside of the political subdivisions in which they reside, R.C. 9.75 provides for the comfort and general welfare of all citizens working in the construction trades.

{¶ 36} We acknowledge the city's assertion that the true motivation of the legislature in enacting R.C. 9.75 was to benefit contractors, not employees. However, "our job is to interpret the statute as written, not to puzzle over motivations." *Sheet Metal Workers' Internatl. Assn., Local Union No. 33 v. Gene's Refrig., Heating & Air Conditioning, Inc.*, 122 Ohio St.3d 248, 2009-Ohio-2747, 910 N.E.2d 444, ¶ 51 (Pfeifer, J., dissenting). We look for the intent of the General Assembly in the language that it enacted, *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 14, and in uncodified law enacted as part of 2016 H.B. 180, Section 4, the legislature stated that enacting R.C. 9.75 was "necessary in order to provide for the comfort, health, safety, and general welfare of those employees [working on Ohio's public-improvement projects]." We may not look behind and second-guess such a plain statement of legislative intent.

{¶ 37} The city contends that "a contractor under the Fannie Lewis Law is free to hire whomever it wants," because the maximum penalty for failing to give Cleveland residents 20 percent of the project's work hours is 2.5 percent of the value of the contract. But another possible penalty is disqualification from bidding on future city contracts. In any case, the question presented in this case is whether Article II, Section 34 authorizes the General Assembly to regulate public-works contracts that subject Ohio's workers to residency preferences or restrictions. And the answer to that question is necessarily the same, regardless of the size of the local-hiring quota or the penalty imposed for failing to meet it—the difference between a 20 percent hiring quota and a 100 percent hiring quota is not one of kind but of degree.

{¶ 38} Pursuant to R.C. 9.75, neither are permissible. Until a majority of this court is prepared to overrule *Lima*, we adhere to our holding that the comfort and general welfare of employees includes their choice of residency. And if the legislature can prohibit a city from preferring its own residents when it hires city

workers, it can also prohibit a city from requiring contractors to prefer the city's own residents in hiring for the city's public-works projects.

**{¶ 39}** Accordingly, R.C. 9.75 is a valid exercise of the power granted by Article II, Section 34 of the Ohio Constitution, and it supersedes the Fannie Lewis Law, a local ordinance enacted by a municipality pursuant to its home-rule authority.

### Conclusion

**{¶ 40}** It is a fundamental precept of our tripartite form of state government that the General Assembly is the ultimate arbiter of public policy. *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, at ¶ 59. Our role "in reviewing legislative enactments is limited to interpreting the meaning of statutory provisions and determining whether they are in accord with the federal and state Constitutions." *Toledo*, 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, at ¶ 31. Questioning the wisdom of the legislature's public-policy decisions does not fall within the scope of that review. *See State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20.

**{¶ 41}** Article II, Section 34 of the Ohio Constitution is an express grant of power permitting the General Assembly to enact laws providing for the comfort, health, safety, and general welfare of Ohio employees that control over local ordinances passed pursuant to a municipality's home-rule authority. This legislative power encompasses laws that regulate what conditions on hiring and employment local governments may impose in their public-improvement contracts.

**{¶ 42}** The General Assembly exercised that constitutional legislative authority to enact R.C. 9.75. This statute provides for the welfare of Ohio employees by prohibiting local-government contracts from imposing hiring preferences that disfavor nonresident employees working in the construction trades. Because R.C. 9.75 falls within the legislative power vested in the General Assembly

by Article II, Section 34 of the Ohio Constitution, it is not limited by the Home Rule Amendment, and the Fannie Lewis Law is not enforceable against contractors on the city of Cleveland's public-improvement projects.

{¶ 43} Accordingly, we reverse the judgment of the Eighth District Court of Appeals and remand this matter to the trial court to dissolve the injunction and enter judgment in favor of the state.

Judgment reversed<br>and cause remanded.

FRENCH and FISCHER, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion joined in part by STEWART, J.

O'CONNOR, C.J., dissents, with an opinion joined by DONNELLY and STEWART, JJ.

_____

**DEWINE, J., concurring in judgment only.**

{¶ 44} I, too, would find that the state legislative enactment prevails over Cleveland's Fannie Lewis Law, but I arrive at the result by a different path than the lead opinion. In my view, the lead opinion dangerously misreads Article II, Section 34 of the Ohio Constitution when it concludes that as long as a legislative enactment affects the "welfare of the working people in Ohio," the law need not comply with any other provision of the Ohio Constitution. Lead opinion at ¶ 3; *see also* lead opinion at ¶ 18-26. When we look to the structure, text, and context of our Constitution, along with the historical record, it is evident that the authority granted to the legislature by Article II, Section 34 to enact laws irrespective of other constitutional safeguards is limited to laws that regulate work hours, set a minimum wage, or regulate the workplace environment.

{¶ 45} Nonetheless, unlike the dissenting justices, I do not believe that the state legislature violated the Home Rule Amendment to the Ohio Constitution.

Rather, I believe it was within the legislature's authority to enact R.C. 9.75 to ban discriminatory hiring requirements on public-improvement projects. As a result, I concur in the majority's judgment but I do not join the lead opinion.

## I. Article II, Section 34

{¶ 46} Article II, Section 34 states that "[l]aws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; *and no other provision of the constitution shall impair or limit this power*." (Emphasis added.) Because of the "no other provision" clause, any law passed under the comfort, health, safety, and welfare clause avoids any other limitation of the Ohio Constitution.

{¶ 47} The lead opinion reads Article II, Section 34 very broadly as authorizing the General Assembly to pass laws for "the assistance, support, well-being, and prosperity of Ohio's working people," lead opinion at ¶ 23. When this expansive reading is paired with the "no other provision" clause, the danger is evident: the section threatens to eviscerate every other constitutional protection. In other words, if the state legislature can plausibly say that it is acting for the welfare of some group of working Ohioans, none of the other constitutional protections apply.

{¶ 48} Consider for a moment what that means. Article I, Section 4 of the Ohio Constitution guarantees the right to bear arms. What if out of concern about workplace shootings the General Assembly prohibits anyone who works in a multi-employee workplace from owning a gun at all? Under the lead opinion's broad reading, Article I, Section 4 presents no obstacle to such a law. Or maybe the General Assembly decides that pre-work prayer is good for employees. Under the lead opinion's approach, the prohibition on compulsory worship in Article I, Section 7 would fall to the wayside. Or, perhaps, the state wants to seize an Ohio company's assets and distribute those assets to the employees for the sake of increasing employee welfare. If that power was exercised through Section 34, the

18

just-compensation requirement of Article I, Section 19 would not apply, because paying compensation would impair the government action.

{¶ 49} In the aforementioned examples, the federal constitution would likely provide protection for Ohio citizens despite the evisceration of the guarantees of the Ohio Constitution. But consider other examples in which no federal constitutional counterpart would apply. Even though the federal right to a jury trial in a civil case has not been incorporated against the states, *see Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 432, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), Article I, Section 5 of the Ohio Constitution guarantees Ohio citizens that right. But, under the lead opinion's reading of Article II, Section 34, the state legislature could abolish the right to a jury trial in cases involving a dispute over an employment contract on the notion that an administrative dispute resolution system would be better for workers. Article XV prohibits lotteries except to support schools, but under the lead opinion's broad reading, the legislature could get around that provision by using lottery profits to benefit working Ohioans. Article VIII of the Ohio Constitution places significant constraints on the ability of the state to incur public debt, but under the lead opinion's view none of the restrictions would apply when it comes to borrowing to support Ohio workers.

{¶ 50} The list could go on and on. The point is that under the lead opinion's reading, the legislature is given carte blanche to disregard all other constitutional safeguards anytime it can plausibly say that something promotes the welfare of working Ohioans.

{¶ 51} Did the Ohio voters who ratified Article II, Section 34 back in 1912 really intend to work such a dramatic reshuffling of our constitutional scheme? Did they mean to give the legislature such a broad constitutional trump card—a mechanism by which it could enact laws that would override all other constitutional protections?

**{¶ 52}** I think not. If we take a careful look at the text, context, broader constitutional structure, and history of Article II, Section 34, it is clear that the provision should not be read nearly as broadly as the lead opinion would have it. And the mistake is not just the lead opinion's today. As I will explain, today's is only the latest in an unfortunate series of opinions that continue to expand the reach of Article II, Section 34 beyond its original meaning.

A. *The text of Article II, Section 34, its context, and the structure of the Constitution limit that provision to regulations of the workplace environment*

**{¶ 53}** I have already touched upon one structural consideration—the incompatibility of the lead opinion's reading of Article II, Section 34 with the other protections afforded by the Ohio Constitution. The Ohio Constitution follows the model of the federal constitution: it sets out the structure and powers of the several branches of state government, *see* Ohio Constitution, Articles II through IV, and it protects certain basic rights of Ohio citizens from infringement by the government, *see* Ohio Constitution, Article I. The Constitution acts as a check on majoritarian impulses by placing certain rights outside of the legislative process. Thus, if the legislature passes a law that infringes upon a right guaranteed by the constitution, the constitutional right ordinarily prevails over the conflicting state law.

**{¶ 54}** Article II, Section 34, however, is in tension with this scheme. It says that in certain instances, a legislative enactment will prevail notwithstanding any other provision of the Ohio Constitution. This tension is a big indicator that the framers of the provision understood that it would be read narrowly. To read it otherwise is inconsistent with the very structure of the constitution itself. A system that is premised upon the idea that certain rights are to be protected irrespective of the temporary whims of the legislative branch cannot sit comfortably with a provision that would allow the legislature to exempt large categories of legislative enactments from all forms of constitutional restraint.

**{¶ 55}** Keeping in mind the implausibility of the lead opinion's reading given our Constitution's structure, let us turn next to the text of Article II, Section 34. Recall that the full text provides:

Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power.

**{¶ 56}** Article II, Section 34 thus authorizes three types of legislative enactments, those (1) fixing and regulating the hours of labor, (2) establishing a minimum wage, and (3) providing for the comfort, health, safety, and general welfare of all employees. Where, as here, specific items in a list are followed by a more general category, a familiar rule of statutory construction, ejusdem generis, says that the more general item is to be construed as of a similar character as the specific items. We have explained:

So, where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term is conjoined having perhaps a broader signification, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms.

*State v. Aspell*, 10 Ohio St. 2d 1, 4, 225 N.E.2d 226 (1967). The principle "parallels common usage" in that "[w]hen the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category

in mind for the entire passage." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012).

{¶ 57} Applying this principle of statutory construction suggests that the general catchall category—providing for the comfort, health, safety, and general welfare—was intended to authorize the legislature to enact legislation of the same genus as the first two categories, regulating hours and minimum wages. Because wage and hour regulations relate to the conditions of employment, the general-welfare clause should be read in a similarly constrained manner.

{¶ 58} That makes sense. Part of the justification for the canon is that when "the tagalong general term is given its broadest application, it renders the prior enumeration superfluous." Scalia & Garner, *Reading Law* at 199-200. This court has long held that no part of an enactment "should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917). But to read the comfort, health, safety, and general welfare provision in the broad manner of the lead opinion is to render the first two categories superfluous. After all, minimum-wage regulations and limitations on hours also promote employee welfare. Thus, to give each term in the provision a distinct role, the comfort, health, safety, and general-welfare clause must be read to exclude minimum-wage and hour regulations.

{¶ 59} One might read the general-welfare clause to allow regulation of the employer-employee relationship, but that would still make the hours and minimum-wage components of the provision unnecessary. Wages and hours are features of how employers and employees relate to one another. To give the minimum-wage and hours provisions an independent role in the provision, the comfort, health, safety, and general-welfare clause must be limited to laws governing the workplace environment.

22

{¶ 60} A similar point can be made about other parts of the constitutional scheme. Article II, Section 35, which was also approved at the 1912 constitutional convention, authorizes the legislature to create a workers' compensation scheme. Without question, a workers'-compensation scheme affects employee welfare in some sense. Hence, if one reads the welfare provision of Section 34 as broadly as the lead opinion does—as encompassing anything related to worker welfare—then Section 35 would be totally unnecessary.

{¶ 61} The same goes for Article II, Section 33, which allows the General Assembly to pass laws that protect "mechanics, artisans, laborers, sub-contractors and material men" by placing a lien on projects that they had a hand in building. That provision also protects worker welfare by helping to ensure payment for labor.

{¶ 62} The records of the proceedings at the 1912 convention show that the delegates sought to avoid unnecessary duplication of constitutional provisions. For instance, Article II, Section 37 of the Ohio Constitution, places an 8-hours-per-day and 48-hours-per-week cap on work done by "workmen engaged on any public work." In discussing the proposal, Mr. Halfhill raised the worry that the Section 34 proposal, which had been adopted the day before, was being unnecessarily duplicated by the Section 37 proposal. 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1340 (1912). Mr. Tetlow, in response, explained that the Section 37 proposal was not duplicative, because it specified the hours of work, rather than merely empowering the legislature to set limits. *Id*. at 1341.

{¶ 63} No similar objection was raised in the debate on the Section 35 workers'-compensation proposal, which occurred almost directly after debate over the Section 37 proposal concluded, or the Section 33 lien proposal, which occurred a couple of days later. *Id.* at 1346, 1412. Thus there is good reason to think that the delegates at the 1912 convention understood Sections, 33, 34, and 35 in a nonoverlapping way. Again, the only plausible reading that accomplishes this is to

construe Section 34's comfort, health, safety, and general-welfare clause as limited to workplace-environment laws.

*B. The historical backdrop to Article II, Section 34 suggests that its reach was limited to the workplace environment*

{¶ 64} Consideration of the text of Article II, Section 34, its context, and the structure of the Constitution indicates that the provision is not as broad as the lead opinion assumes and instead should be limited to laws regulating the workplace environment. But if there are any remaining doubts, the transcripts of the debates at the constitutional convention, legislation passed by the General Assembly directly after the amendment, and court cases discussing Article II, Section 34 in the first several years after its enactment bolster that conclusion.

{¶ 65} Article II, Section 34 was adopted for submission to the voters at Ohio's 1912 constitutional convention. The historical record shows that it was aimed at a very specific set of problems. In the late 1800s and early 1900s, courts routinely struck down laws that regulated the hours of work on substantive-due-process and freedom-of-contract grounds. Courts also limited the duties of employers to provide safe and healthful work environments. And the constitutionality of minimum-wage laws was in doubt. *See* 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1331 (1912). Article II, Section 34 was adopted to ensure that the General Assembly had the power to pass legislation on these topics. *Id*. at 1335.

{¶ 66} The most famous case to which Article II, Section 34 was responding is the United States Supreme Court case, *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). There, the Court held that a law regulating hours in bakeries was unconstitutional, because it was outside the state's police power and thus improperly infringed on the right of employers and employees to contract with one another. *Id.* at 57-58, 64. Similar conclusions had been reached in Ohio courts. For instance, in *Cleveland v. Clements Bros. Constr. Co.*, the Ohio Supreme

Court struck down a statute limiting the hours of workers in certain public-works contracts, because it violated the freedom to contract and was not sufficiently justified by considerations of public welfare to count as a legitimate exercise of the state's police power. 67 Ohio St. 197, 65 N.E. 885 (1902), paragraphs one and two of the syllabus.

{¶ 67} At the same time, courts were also limiting the liability of employers for industrial accidents. For instance, in *Cincinnati, Hamilton & Dayton Ry. Co. v. Frye*, the Ohio Supreme Court held that an employer need not guarantee a safe work environment for employees—ordinary care was enough. 80 Ohio St. 289, 299, 88 N.E. 642 (1909). As Justice Wanamaker explained a few years after the 1912 convention, the 1909 decision in *Frye*, which limited liability of employers, was " 'had in mind' by the constitutional convention when they proposed and adopted Section 34 as to safety." *Am. Woodenware Mfg. Co. v. Schorling*, 96 Ohio St. 305, 344-345, 117 N.E. 366 (1917) (Wanamaker, J., dissenting).The convention transcripts also show that workplace conditions were on the mind of the delegates. One delegate, Mr. Dwyer, voiced a concern to provide "employes fair living wages, good sanitary surroundings during hours of labor, protection as far as possible against danger, [and] a fair working day" so as to "[m]ake his life as pleasant for him as you can consistent with his employment." 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1332-1333 (1912). Another, Mr. Lampson, noted that "one of the greatest evils in the industrial situation in this country today is what is known as sweatshop work." *Id*. at 1332. The worry expressed at the convention was that cases like the "bake-shop case in New York," i.e., *Lochner*, were overturning state laws aimed at worker protection. *Id.* at 1335. And the goal of the proposal that would become Article II, Section 34, was to clarify that the state had the power to pass such laws. *Id*. But there is no indication that the delegates understood the provision to authorize anything more than legislation relating to wages, hours, and the workplace environment.

**{¶ 68}** In 1913, the year after the constitutional convention, the General Assembly passed the Industrial Commission Act of 1913, which put into effect the new laws that Article II, Section 34 ensured it could pass. Am.S.B. No. 137, 105 Ohio Laws 95 ("Industrial Commission Act"). These laws provide further evidence that the scope of Section 34's comfort, health, safety, and general-welfare clause was originally understood to be limited to workplace-environment issues.

**{¶ 69}** The most telling data point is that whenever the Industrial Commission Act speaks of worker "welfare" or "safety," it is always in conjunction with the "place of employment." *See* Industrial Commission Act at Sections 15-17, 20, 21. The specific duties imposed by the act also show a concern solely with the workplace environment. Section 15 of the act imposes a duty on employers to "furnish a place of employment which shall be safe for the employes therein, and for frequenters thereof," the latter defined as nontrespassers who may go or be in the place of employment, *id.* at Section 13(5) (defining "frequenter"). Explicitly mentioned is a duty to use safety devices and safeguards and safe methods and processes. *Id.* at Section 15. In several provisions, the act also imposes a more general duty to "do every other thing reasonably necessary to protect the life, health, safety and welfare of such employes and frequenters." *Id.* at Sections 15, 17; *accord* Section 16. And Section 20 allows the commission to inspect the place of employment in order to assess the "health, safety, and welfare of the employes therein." In short, the act is concerned with protecting employees and frequenters from what we might colloquially call workplace hazards. Nothing in the act reaches outside the workplace environment to serve worker welfare in a more general sense.

**{¶ 70}** Cases interpreting Article II, Section 34 shortly after its adoption also paint a consistent picture showing that the comfort, health, safety, and general-welfare clause was understood only to allow regulation of the workplace environment. For instance, in 1916, in the case of *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney*, the court described Article II, Section 34 as

representing a "broad humanitarian policy of the state to safeguard the life, limb, health, and safety of its people employed in the industrial world." 95 Ohio St. 64, 70, 115 N.E. 505 (1916).

{¶ 71} In two other cases, Justice Wanamaker explained the relevance of Section 34. *Patten v. Aluminum Castings Co.*, 105 Ohio St. 1, 50-55, 136 N.E. 426 (1922) (Wanamaker, J., dissenting from original opinion); *Toledo Cooker Co. v. Sniegowski*, 105 Ohio St. 161, 176, 136 N.E. 904 (1922) (Wanamaker, J. dissenting). In *Patten*, Justice Wanamaker described the evils that Ohio's new employment-related constitutional provisions aimed to ameliorate. *Patten* at 50. Those included "[a]n appalling number of industrial accidents, resulting in the death of thousands and the disability, partial or complete, of a still larger number of working men, working women, and working children." *Id.*

{¶ 72} In *Toledo Cooker*, he explained that the comfort, health, safety, and general-welfare clause was a direct response to the Ohio Supreme Court's decision in *Frye*, 80 Ohio St. 289, 88 N.E. 642. *Toledo Cooker* at 176-177. As noted above, in *Frye* the court limited the legal duty of an employer to that of ordinary care—the court explicitly rejected the view that the employer had a duty to ensure that the place of employment was safe. *Frye* at 299. As Justice Wanamaker described it: "There is little wonder that the working men of Ohio demanded something better, something higher and more humane for their protection in the workshops and factories. Hence Section 34 of the Constitution and the legislation of 1913 [i.e., the Industrial Commission Act of 1913] followed." *Toledo Cooker* at 177. It is telling that the comfort, health, safety, and general-welfare clause was a direct response to *Frye*, a case dealing with liability for injuries within the workplace environment.

{¶ 73} In sum, the historical evidence paints a uniform picture. The comfort, health, safety, and general-welfare clause was originally understood as ensuring that the General Assembly had the authority to protect workers in their place of work. There is absolutely no evidence that it reached any further than this,

and because of the "no other provision" clause, common sense dictates that we presume its reach was limited in this way absent contrary evidence. The delegates to the 1912 convention and the voters who enacted the amendment should not be presumed to have created the potential for constitutional suicide by employment regulation.

*C. Over the past few decades, this court has expanded the scope of the Section 34 powers*

{¶ 74} Prior to 1967, this court's decisions invoking Article II, Section 34, all related to workplace safety and protection, minimum-wage laws, and hours regulations. *See Akron & Barberton Belt RR. Co. v. Pub. Util. Comm.*, 148 Ohio St. 282, 286, 74 N.E.2d 256 (1947) (railroad-safety laws); *Strain v. Southerton*, 148 Ohio St. 153, 156, 74 N.E.2d 69 (1947) (minimum wage); *State v. Kidd*, 167 Ohio St. 521, 527, 150 N.E.2d 413 (1958) (law limiting labor on Sundays); *State ex rel. Strain v. Houston*, 138 Ohio St. 203, 207, 34 N.E.2d 219 (1941) (regulating the hours of local firefighters).

{¶ 75} Then in 1967, in what can charitably be described as an under-reasoned opinion, this court held that a state law transferring the assets of local firefighter pension funds to a state fund was authorized by the Section 34 powers. *State ex rel. Police & Firemen's Pension Fund Bd. of Trustees v. Police Relief & Pension Fund of Martins Ferry Bd. of Trustees*, 12 Ohio St.2d 105, 107, 233 N.E.2d 135 (1967). The floodgates opened. In 1989, over vigorous dissent, this court held that a statute requiring public employers to engage in binding arbitration with their employees was authorized by the "general welfare" portion of Article II, Section 34. *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 13, 539 N.E.2d 103 (1989). In 1999, this court suggested in passing that a law *increasing* the workload of university professors could be passed under Article II, Section 34, thereby turning a constitutional provision aimed at protecting workers on its head. *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio

St.3d 55, 62, 717 N.E.2d 286 (1999). And in 2009, again over vigorous dissent, this court held that a state law prohibiting municipalities from imposing residency requirements on their workers was an exercise of the Section 34 powers. *Lima v. State*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, ¶ 16.

### D. R.C. 9.75 cannot be passed under Article II, Section 34

{¶ 76} While some of our case law has already expanded the Section 34 powers beyond the provision's original meaning, those cases can at least be categorized as all dealing with matters within the employer-employee relationship. The lead opinion, today, goes a step further and concludes that a law that does not govern the employer-employee relationship at all, but merely indirectly affects employee welfare, is a Section 34 law.

{¶ 77} In continuing to expand the scope of Section 34 in ways never countenanced by the people of 1912, this court is well on its way to transforming a coherent constitutional scheme into a confusing and unstable muddle. Instead of taking a further step down this misguided path, we should at least stop and find that R.C. 9.75 cannot be passed under the Section 34 powers because it does not govern even the employer-employee relationship, much less the workplace environment. That conclusion could be reached without having to revisit any of our prior holdings. A far better result, though, would be for this court to do a course correction and return our case law to the original meaning of Article II, Section 34. Such a result would restore the balance among our constitutional provisions envisioned by their framers and ensure that Section 34 cannot improperly be used as a vehicle to strip Ohioans of the other rights guaranteed to them.

### II. Home Rule

{¶ 78} The fact that R.C. 9.75 cannot be enacted under Article II, Section 34 does not mean that it cannot be enacted at all. As this court has noted, the legislature has authority to enact any law that is not prohibited by the Ohio or United States Constitutions. *Toledo v. State*, 154 Ohio St.3d 41, 2018-Ohio-2358,

110 N.E.3d 1257, ¶ 17.  Here, Cleveland argues that R.C. 9.75 conflicts with the Ohio Constitution's Home Rule Amendment.  Not so.

**{¶ 79}** The Home Rule Amendment reads: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."  Ohio Constitution, Article XVIII, Section 3. Thus, a state statute will displace a local ordinance when (1) the ordinance is in conflict with the state statute, (2) the ordinance is an exercise of the police power, rather than a power of local self-government, and (3) the state statute is a general law.  *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17.  Only the second and third conditions are at issue here.

### A.  *The Fannie Lewis Law is an Exercise of the Police Power*

**{¶ 80}** The first question is whether the Fannie Lewis Law is an exercise of a power of local self-government or an exercise of the police power.  The distinction is usually cashed out in terms of whether the ordinance relates solely to the government and administration of the internal affairs of the municipality or instead aims to protect the public health, safety or morals, or the general welfare.  *In re Complaint of Reynoldsburg*, 134 Ohio St.3d 29, 2012-Ohio-5270, 979 N.E.2d 1229, ¶ 25; *Ohioans for Concealed Carry, Inc. v. Clyde*, 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967, ¶ 35.

**{¶ 81}** Paradigmatic of the powers of local self-government are laws that control how a local government will organize itself and make decisions, for instance, by settling on a method for electing municipal officers, *see Fitzgerald v. Cleveland*, 88 Ohio St. 338, 347, 103 N.E. 512 (1913).  In contrast, our cases show that when an ordinance aims at controlling the behavior of third parties in service of public health, safety, or welfare, it is an exercise of the police power.  For instance, in *Clyde*, this court held that a local ordinance prohibiting the carrying of concealed handguns in city parks was an exercise of the police power.  *Clyde* at ¶ 1.

In *Reynoldsburg*, this court held that a city ordinance giving the city's public-service director the right to order utilities to remove or rearrange certain utility facilities solely at the utility's expense was an exercise of the police power. *Reynoldsburg* at ¶ 26, 37. In *Marich v. Bob Bennett Constr. Co.*, this court held that an ordinance limiting the weight of vehicles on city streets was an exercise of the police power. 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, ¶ 15. And in *Ohio Assn. of Private Detective Agencies v. N. Olmsted*, this court held that local licensing requirements for private investigators were an exercise of the police power. 65 Ohio St.3d 242, 602 N.E.2d 1147 (1992), syllabus. The theme that unites all of these cases is that when a local ordinance regulates the behavior of third parties in service of public health, safety, or welfare, it is an exercise of the police power and not merely a power of local self-government.

{¶ 82} What does this mean for the Fannie Lewis Law? The Fannie Lewis Law requires city contracts to include certain terms that impose a penalty on public-works contractors that do not employ a sufficient number of Cleveland residents. Cleveland Codified Ordinances Chapter 188. Cleveland argues that because the ordinance directly governs only the city's power to contract, it is not an exercise of the police power. And Cleveland notes that this court has held that at least some exercises of the power to contract fall squarely within the sphere of local self-government. *See, e.g.*, *Dies Elec. Co. v. Akron*, 62 Ohio St.2d 322, 327, 405 N.E.2d 1026 (1980).

{¶ 83} But it's not true that *any* time a city exercises its power to contract it is merely exercising a power of local self-government. As the United States Supreme Court has recognized in a different legal context, contracts are not always just a way to participate in a market; sometimes they function as market regulations. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 97, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). Thus, in *Wunnicke*, the Court held that a statutorily mandated contract term requiring that state timber be processed in Alaska was functionally a

regulation of the timber industry. *Id.* at 97-99. And it did not matter that the regulatory goal was accomplished through contract, instead of by statute or regulation. *Id.* at 97.

{¶ 84} The Fannie Lewis Law is functionally a regulation of the behavior of contractors in their dealings with their employees and is not merely an innocent exercise of Cleveland's power to spend money as it sees fit. To see why, consider a city ordinance that imposes a fine on contractors that do not employ a sufficient number of local residents. That would unquestionably be an exercise of the police power; it imposes a penalty in order to control the behavior of third parties. But that is precisely what the Fannie Lewis Law does, albeit by way of contract rather than through an ordinance. To pretend that the Fannie Lewis Law is not an exercise of the police power because it achieves its result through contract rather than direct regulation is a blinkered kind of formalism that ignores reality. Powerful economic actors like Cleveland can effect regulatory ends through the power of contract. That is what Cleveland attempts to do with the Fannie Lewis Law.

## B. R.C. 9.75 is a General Law

{¶ 85} In suggesting that R.C. 9.75 is not a general law, the dissent relies on this court's four-part *Canton* test. *See Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 21. I have argued before that the test is unworkable and that we should abandon it and return to the original understanding and the plain language of the Home Rule Amendment. *Dayton v. State*, 151 Ohio St.3d 168, 2017-Ohio-6909, 87 N.E.3d 176, ¶ 83-98 (DeWine, J., dissenting). As originally understood, "general law" was nowhere near the confusing morass that this court's decisions have turned it into. As one delegate at the 1912 convention noted, "[c]ourts have thoroughly well settled the construction of that term." 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1471 (1912). And indeed they had. For instance, in *Cincinnati St. Ry. Co. v. Horstman*, 72 Ohio St. 93, 73 N.E. 1075 (1905), this court defined a general law as:

"A law framed in general terms, restricted to no locality, and operating equally upon all of a group of objects, which, having regard to the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves, is not a special or local law, but a general law."

*Id.* at 109, quoting *State ex rel. Van Riper v. Parsons*, 40 N.J.L. 123 (1878), paragraph one of the syllabus. Black's Law Dictionary contained the same definition at the time of the enactment of the Home Rule Amendment, *Black's Law Dictionary* 710 (2d Ed.1910).

{¶ 86} Is R.C. 9.75 a general law under this standard? On its face, it applies only to "public authorities." R.C. 9.75(B)(1); R.C. 9.75(B)(2). The statute defines "public authority" to include the state, counties, townships, municipal corporations, or any other political subdivision of the state; any public agency, authority, commission, instrumentality, or special district of the state, a county, township, municipal corporation, or political subdivision of the state; and any officers or agents of such entities. R.C. 9.75(A)(6)(a) through (d). Because R.C. 9.75 applies only to public authorities, the dissent concludes that it is not a general law because it does not "prescribe a rule of conduct on Ohio's citizens generally," dissenting opinion at ¶ 99. But that is not how a general law would have been understood in 1912. To count as a general law, the law need not apply to citizens generally but rather to a group of objects that are "distinguished by characteristics sufficiently marked and important to make them a class by themselves," *Horstman* at 109, quoting *Parsons* at paragraph one of the syllabus.

{¶ 87} Many laws apply only to a subset of the population. For instance, laws regulating electricity producers apply only to electricity producers and not to ice-cream makers. But if a law aims to limit emissions, electricity producers are

"distinguished by characteristics sufficiently marked and important to make them a class by themselves," *id.* This is because electricity producers are prominent and substantial contributors to emissions. As the *Horstman* court explained, "[c]lassification is often proper and sometimes necessary in legislation, in order to define the objects on which a general law is to take effect, and in order to effectuate the purposes of the legislation." *Horstman*, at 108 (quoting *Gentsch v. State*, 71 Ohio St. 151, 72 N.E. 900 (1904), paragraph one of the syllabus). In such cases, a law that applies to a particular class is still a general law.

{¶ 88} Are public authorities (as distinct from private contracting parties) distinguished by characteristics that are "sufficiently marked and important" to make them a relevant class for purposes of preventing discrimination in employment based on residency? The answer is yes. Public authorities have a history of favoring local residents and an incentive to do so. And it is sensible for a legislature to target a class when that class has a history of behavior that the state seeks to curtail. In contrast, it would be rather idiosyncratic for a private contractor to care about where its employees reside. The General Assembly need not legislate to solve a problem that doesn't exist in order for its solution to a problem that does exist to count as a general law.

{¶ 89} Because R.C. 9.75 is a general law, it prevails over Cleveland's Fannie Lewis Law.

### III. Conclusion

{¶ 90} In sum, R.C. 9.75 cannot be passed under the powers granted by Article II, Section 34, because it does not regulate hours, set a minimum wage, or regulate the workplace environment in order to secure the comfort, health, safety, or general welfare of employees. But R.C. 9.75 is still a lawful exercise of the General Assembly's legislative power that does not violate the Ohio Constitution's Home Rule Amendment. It is a general law that preempts conflicting local

exercises of the police power, like the Fannie Lewis Law. I therefore concur in the majority's judgment reversing the court of appeals.

STEWART, J., concurs in Part I of the foregoing opinion.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 91} Because R.C. 9.75 is not a valid exercise of the legislature's authority pursuant to Article II, Section 34 of the Ohio Constitution and because the statute violates a municipality's home-rule power under Article XVIII, Section 3 of the Ohio Constitution, I dissent.

### *R.C. 9.75 does not fall under the General Assembly's authority in Article II, Section 34 of the Ohio Constitution*

{¶ 92} The lead opinion concludes that the General Assembly is authorized under Article II, Section 34 "to pass laws regulating public-improvement contracts when necessary to provide for the comfort and general welfare of Ohio employees." Lead opinion at ¶ 33. And, it concludes, R.C. 9.75 "provides for the comfort and general welfare" of construction-trade workers "[b]y providing an equal opportunity for Ohioans to compete for work on public-improvement projects both inside and outside of the political subdivisions in which they reside." Lead opinion at ¶ 35.

{¶ 93} But R.C. 9.75 is not about wages, hours, or workplace conditions and hazards. These were the issues in the minds of members of the constitutional convention during which Article II, Section 34 was proposed. *See* lead opinion at ¶ 19; *see also Lima v. State*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, ¶ 30-31 (Lanzinger, J., dissenting); *Rocky River v. State Emp. Relations Bd.*, 43 Ohio St.3d 1, 14-15, 539 N.E.2d 103 (1989). And these were the types of issues present in our prior decisions to uphold laws under Article II, Section 34. *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 717 N.E.2d 286 (1999) (upholding a state law regulating faculty labor hours at

public universities); *Rocky River* at 20 (upholding a state law mandating a bargaining procedure in disputes between public employers and employees because it "serves the purpose of promoting orderly public sector labor relations"); *State ex rel. Bd. of Trustees of Police & Firemen's Pension Fund v. Bd. of Trustees of Police Relief & Pension Fund of Martins Ferry*, 12 Ohio St.2d 105, 233 N.E.2d 135 (1967) (upholding a law creating a state-controlled disability-and-pension fund for police and fire personnel).

**{¶ 94}** It is true that in *Lima*, we upheld a state law that prohibited a political subdivision from imposing a residency requirement on its employees. We concluded that the law was validly enacted pursuant to Article II, Section 34 because the law provided "for the comfort and general welfare of public employees by ensuring that [employees] will be able to choose the municipality in which they reside." *Id.* at ¶ 14.

**{¶ 95}** R.C. 9.75 does not exclude or regulate workers. It potentially affects the employer's bottom line and nothing else. R.C. 9.75 prohibits a public authority engaging in a public-improvement project from including contract terms that require a contractor to employ a certain number or percentage of laborers who reside within the public authority. Thus, R.C. 9.75 seeks to affect only how a public authority does business with its contractors.

**{¶ 96}** The local-ordinance residency requirements that were declared invalid in *Lima* acted as a complete bar to city employment *unless* one resided within the municipality. *Lima*, 122 Ohio St.3d 155, 2009-Ohio-2597, 909 N.E.2d 616, at ¶ 2, 4. They were local laws that directly affected workers' choice of residency. The city of Cleveland's Fannie Lewis Law does no such thing. The Fannie Lewis Law is applicable only to contractors who are working on public contracts in excess of $100,000. Cleveland Codified Ordinances 188.01(b). An affected contractor can hire whomever it wishes. Resident and nonresident workers are eligible to work 100 percent of the labor hours. If the contractor chooses not to

use resident-worker labor for at least 20 percent of the labor hours required, the contractor does not lose the contract—it just forfeits a portion of the contract price as a penalty. *See* Cleveland Codified Ordinances 188.02, 188.05(b) (a contractor that has not been otherwise excused from compliance shall pay one-eighth of one percent, or .125%, of the total amount of the contract for each percentage of the 20 percent it does not meet). The Fannie Lewis Law says nothing about workers shouldering any burden, being paid less, or being subjected to different hours or working conditions. And it does not restrict workers' choice of residency.

{¶ 97} The lead opinion concludes that R.C. 9.75 protects all construction-trade workers from residency restrictions. The rationale seems to be that any preference based on a worker's residency is a detriment to every worker who resides anywhere. But that rationale overlooks the fact that R.C. 9.75 works to the detriment of the workers who benefit from the Fannie Lewis Law. As applied to the Fannie Lewis Law or similar ordinances, R.C. 9.75 protects only the *contractors* that are seeking public-improvement-project contracts and do not wish to employ local resident workers for at least 20 percent of the construction hours performed under the contract. It is undeniable that R.C. 9.75 would potentially affect the demographics of the workers on all public projects in the urban areas of this state. Interpreting R.C. 9.75 as the lead opinion instructs only restricts municipalities from taking proactive measures to provide employment for residents of our urban areas that have historically experienced underemployment. This cannot be the result the legislature envisioned.

### *R.C. 9.75 is not a general law*

{¶ 98} If not authorized under Article II, Section 34 of the Ohio Constitution, R.C. 9.75 cannot stand if it violates a municipality's home-rule authority. Article XVIII, Section 3 of the Ohio Constitution provides that municipalities may "exercise all powers of local self-government and * * * adopt and enforce within their limits such local police, sanitary and other similar

regulations, as are not in conflict with general laws." Even if we assume for our analysis that the local ordinances here are "local police, sanitary and other similar regulations," I would still hold that R.C. 9.75 is not a general law, so it cannot take precedence over the local ordinances.

{¶ 99} A state statute controls if "(1) the ordinance is an exercise of the police power, rather than of local self-government, (2) *the statute is a general law*, and (3) the ordinance is in conflict with the statute." (Emphasis added.) *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17. A general law is one that (1) is part of a statewide and comprehensive legislative enactment, (2) applies to all parts of the state alike and operates uniformly throughout the state, (3) sets forth police, sanitary, or similar regulations, rather than purporting only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribes a rule of conduct upon citizens generally. *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 21.

{¶ 100} At a minimum, R.C. 9.75 fails to meet the third and fourth requirements of a general law. As stated in the bill, the purpose of the statute is "to prohibit a public authority from requiring a contractor to employ a certain percentage of individuals from the geographic area of the public authority for the construction or professional design of a public improvement." 2016 H.B. No. 180. It is clear from this legislative statement that the law exists to limit a municipality's authority to establish certain contract terms with contractors. There is no "police, sanitary, or similar" purpose served by R.C. 9.75. And the law does not prescribe a rule of conduct on Ohio's citizens generally. Instead, it seeks to prescribe the specific terms of a contract between a public authority and a contractor that it does business with for certain public-improvement projects. In this way, R.C. 9.75 applies to limit a municipality's legislative body, not citizens generally. *See Canton* at ¶ 34-36.

{¶ 101} Because R.C. 9.75 is not a general law, it cannot preempt the Fannie Lewis Law. I would hold that R.C. 9.75 is an invalid limitation on a municipality's home-rule authority under Article XVIII, Section 3 of the Ohio Constitution. For the foregoing reasons, I dissent and would affirm the Eighth District Court of Appeals.

DONNELLY and STEWART, JJ., concur in the foregoing opinion.

_____

Barbara A. Langhenry, Cleveland Director of Law, Gary S. Singletary, Chief Counsel, and L. Stewart Hastings and Elizabeth M. Crook, Assistant Law Directors, for appellee.

Dave Yost, Attorney General, Benjamin M. Flowers, State Solicitor, Stephen P. Carney, Deputy Solicitor, and Zachary P. Keller, Assistant Attorney General, for appellant.

Frost Brown Todd L.L.C., Philip K. Hartmann, and Yazan S. Ashrawi; and Garry E. Hunter, urging affirmance for amicus curiae Ohio Municipal League.

Scott & Winters Law Firm, L.L.C., and Joseph F. Scott, urging affirmance for amici curiae Campaign to Defend Local Solutions, Legal Scholars, and International Municipal Lawyers Association.

Eve V. Belfance, Akron Director of Law, and Brian D. Bremer, Assistant Law Director, urging affirmance for amicus curiae city of Akron.

Zach Klein, Columbus City Attorney, Lara N. Baker-Morrish, City Solicitor General, and Orly Ahroni, Assistant City Prosecutor, urging affirmance for amicus curiae Columbus City Attorney Zach Klein.

Graff and McGovern, L.P.A., and Luther L. Liggett Jr., urging reversal for amicus curiae AIA Ohio.

Ice Miller, L.L.P., and Patrick A. Devine, urging reversal for amici curiae Ohio Contractors Association, Associated General Contractors of Ohio, National Federation of Independent Business, and Ohio Chamber of Commerce.

Fadel & Beyer, L.L.C., Timothy R. Fadel, and Jonah D. Grabelsky, urging reversal for amicus curiae International Union of Operating Engineers, Local 18.

Weston Hurd, L.L.P., Frederick T. Bills, and David T. Patterson, urging reversal for amicus curiae American Council of Engineering Companies of Ohio.

—————————————