[Cite as *In re J.F.*, 2026-Ohio-212.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY


In re J.F., N.F., R.G.

Court of Appeals No. H-25-003
H-25-004
H-25-005

Trial Court No. DNA 2024 074
DNA 2024 075
DNA 2024 076


**DECISION AND JUDGMENT**

Decided: January 23, 2026

* * * * *

Anthony J. Richardson, II, for appellant.

* * * * *

**OSOWIK, PJ.**

**{¶ 1}** These are consolidated appeals from the judgments by the Huron County

Court of Common Pleas, Juvenile Division, which placed three minor children, J.F., N.F.,

and R.G., of appellant-father, Ja.F. (hereafter "Father"), in the temporary custody of a

maternal relative subject to the protective supervision of appellee, Huron County

Department of Job & Family Services, after adjudicating J.F. and N.F. dependent and

neglected children and after adjudicating R.G. a dependent child. Father is the legal

custodian of the children. The children's mother did not appeal the judgments. Therefore, our discussion will be limited to Father.

{¶ 2} Father sets forth two assignments of error:

1. The trial court committed reversible error by hindering and infringing upon appellant's parental rights.
2. The trial court committed error by placing appellant's children with people who have no relationship with the children.

## I. Background

{¶ 3} On October 25, 2024, appellee filed three complaints against Father alleging dependency under R.C. 2151.04(C) and neglect under R.C. 2151.03(A)(3) of six-year-old J.F., eight-year old N.F., and four-year-old R.G.[1] Appellee alleged that starting on or about August 20, 2024, appellee received concerns from the children's school that there was little food in the home; the children were being treated for worms; the children's teeth hurt when chewing food and one had a tooth abscess and pro-bono dental exams and a referral to a Medicaid-authorized pediatric dentist were ignored; the children frequently arrived late for school dirty and unbathed; N.F. required wound care by the school nurse for untreated scratches on his arm; Father and/or paternal grandmother, C.F., would forget to pick up the children after normal school dismissal time; and Father, who was unemployed and did not have health benefits, ignored appellee's efforts to assist him

---

[1] The complaint for J.F. was assigned case No. DNA-2024-00074; the complaint for N.F. was assigned case No. DNA-2024-00075; and the complaint for R.G. was assigned case No. DNA-2024-00076.

2.

with finding work and to provide transportation of the children to the pediatric dentist who accepted Medicaid. Father resisted efforts by appellee and the local police for in-home welfare checks on the children.

{¶ 4} Appellee sought the juvenile court to "grant temporary or legal custody to a relative or interested party, permanent or temporary custody to the Huron County Department of Job and Family Services with protective supervision or permanent planned living arrangements."

{¶ 5} The juvenile court immediately held an emergency shelter-care hearing on October 25, 2024, at which Father and paternal grandmother were present. At the hearing the juvenile court ordered, among other matters, placing the children in the temporary custody of Father "under the intense protective supervision of the Huron County Department of Job and Family Services." When asked by the juvenile court if he'd "like the Court to consider appointing counsel for you," Father responded, "Potentially. . . . Within reason, as needed" but took no further steps on the record. Father told the juvenile court that he understood the children's acute dental and medical needs.

> Court: And you'll follow through with the appointment and all the recommendations that you receive from the dentist and doctors?
> A: Yep, yep.

{¶ 6} Then on December 3, 2024, appellee filed a request for the juvenile court to appoint an attorney and guardian-ad litem for Father because, "The agency has received a number of emails from [Father] regarding totally unrelated subject matters making effective communication with the father questionable. The Agency wishes to make sure

3.

[Father] is adequately represented in the above case." The next day Father attended a telephone conference with the attorneys and parties in the three cases. At the conclusion of the hearing, the juvenile court appointed Father an attorney, denied appellee's request to appoint him a guardian ad litem, and confirmed the adjudicatory hearing on December 16, 2024.

{¶ 7} The next step in the case was the adjudication hearing. Father attended with his appointed counsel as well as the mother's uncle and his girlfriend. Paternal grandmother did not attend the hearing. During the hearing the juvenile court admitted one exhibit into evidence and received testimony from five witnesses: the children's elementary school principal, the office manager of the diagnosing dentist, the elementary school nurse, appellee's case investigator, and Father.

{¶ 8} The school personnel, dental provider, and the case investigator collectively testified to personally witnessing the children's hunger upon arriving at school, painful dental conditions (J.F. had four, and N.F. had seven, decaying teeth), poor hygiene, dirty clothing and no underwear, N.F.'s untreated, pus-filled arm wounds, and Father's frequent tardy delivery of the children for school and late pickups. The school routinely had to wash, brush, feed and clothe the children to get through the school day, resulting in the children only being in the classroom to receive instruction forty-eight percent of the time. At one point the children reported that their father told them to refuse the school's breakfast. In addition, the dental office created a pro bono treatment plan for J.F. and N.F. to see a pediatric dental specialist who accepted Medicaid, and the school

4.

offered to provide the necessary transportation, but Father dragged his feet to provide for his children's dental health. The case worker repeatedly tried to arrange in-person home visits to view the conditions but was thwarted by Father's refusal to answer his phone, to return messages, or to open the door when appellee was determined to visit.

{¶ 9} Father testified that he was unaware of his children's significant dental and hunger issues, even though he signed the permission slips for the children to be seen by the dentist. Nevertheless, Father stated that he took care of all the children's dental issues because when J.F. returned from the August 2024 dentist evaluation "she told me that the dentist told her there was nothing wrong," although the office manager, school principal, and school nurse testified that J.F.'s tooth pain was so great that she cried. He admitted that J.F. did complain about a toothache in October 2024. He further stated that he cooperated with appellee "one hundred percent" and insisted he did not have to let appellee into his home while he had temporary custody of the children. When asked if there was anything else he wished to address with the juvenile court, Father said, "Um, honestly, I think I had, they're in a sense, there has been some, like indiscrimination [sic.], just based on personal beliefs that I have. . . They almost made it apparent on the last court hearing when they had brought up personal beliefs of mine as a route for misinterpretation." None of what Father refers to is in the record before us.[2]

---

[2] A transcript of the December 4, 2024 telephone hearing on appellee's request to appoint for Father's guardian ad litem is not in the record, but the judgment entry denying appellee's request is. It is well-settled that where Father did not include a transcript of a

5.

{¶ 10} When asked if Father understood that the children had to arrive by the start of school, he replied, "Yeah. And again, unless you can show me some proof about them being late, I would rather not talk about it." Then when asked if he fed and clothed the children, who were four, six, and eight years old, before school, Father replied:

> Yeah. I make food. If they don't eat it, that's, again, they're children. I try and teach them responsibility to some discern [sic.]. Again, I wash their clothes. I lay their clothes out. They get their selves dressed. That's kind of the idea. . . . You know, yeah, like I'll help them, but for the most part, I'm trying to have them dress themselves, so. . . . I notice that my son will not put underwear on. I don't know what his problem is. He, I don't know what it is. Just sometimes he just won't put his underwear on. I don't know.

{¶ 11} When asked if Father could explain the wounds observed on N.F.'s arm that were filled with pus, he replied, "If there were no pictures, again, I think they're just, he had a scratch. . . . Well, I'm saying that, it's a normal, normal thing in life that sometimes you may have an accident."

{¶ 12} When asked why the children were not eating the breakfasts he provided, Father replied, "Like they're just kids; you know what I mean?" When asked if had ever told the children not to accept breakfast from the school, Father denied that and then testified, "No, I [--] actually they told me that they were treated very poorly at that school." Yet Father did not contact the school with those concerns because, "No, I can

---

hearing, we must assume the regularity of that hearing. *State v. Grimes*, 2017-Ohio-2927, ¶ 20.

see it. I can see it. It's pretty apparent. But like I, I believe in God as a person, and I just wanted them to have some type of moral[s]."

{¶ 13} At the conclusion of the witness testimonies, introduction of evidence, and closing arguments, the juvenile court found by clear and convincing evidence to adjudicate J.F., N.F., and R.G. dependent children under R.C. 2151.04(C), and to adjudicate J.F. and N.F. neglected children under R.C. 2151.03(A)(3), thereby dismissing the neglect-count of the complaint for R.G. The juvenile court further ordered placing the children in the temporary custody of mother's uncle and his girlfriend under appellee's protective supervision, granted Father supervised visitation with the children, and ordered Father to submit to random substance abuse screens. Mother had recommended her uncle and girlfriend to appellee, who conducted a site visit, SACWIS (Statewide Automated Child Welfare Information System) review, was in the process of its own home study, and found a previously approved home study in 2023 by Richland County for legal custody of another child. Father's mother, who was also under consideration by appellee, was uncooperative to facilitate a home study and gave conflicting information about whether her boyfriend also lived in the home.

{¶ 14} Then on January 16, 2025, the juvenile court held the disposition hearing for the dependent and neglected children J.F. and N.F. and for the dependent child R.G. Father addressed the juvenile court after his court-appointed attorney notified the court that he "is very upset about the goings on at the last hearing." After telling the juvenile court that "I have legal rights to own weapons in America. . . . The kids definitely don't

7.

know where my guns are" in response to appellee's concern that the children reported knowing about the guns and where they were located in his home, he then accused mother of "coaxing them into what to say" in order to avoid her child support obligations and of having her boyfriend "sleeping in the same room with my children." Father continued, although it is unclear to whom he was referring:

> [D]uring our last hearing and the hearing before that, he had stated that my beliefs were science fiction. And again, I have personal particular rights in America. Him, he shouldn't have, you shouldn't have a biased opinion to begin with. Okay? The way that he had said, called my beliefs, and not only my beliefs, but my views, and just who I am as a person, science fiction. And then you allowed it. Like neither, I believe neither one of you should be making any decisions anymore on this case. And we should, to protect the sanctity of just the Court and the way that this should be done and handled, to move forward, we shouldn't make any more decisions. They should be going to somebody else.

{¶ 15} The juvenile court approved the December 11, as updated on December 18, family case plan proposed by appellee, which had the permanency goal of reunification, and continued the children's temporary placement with the maternal uncle and girlfriend under appellee's protective supervision. The juvenile court further accepted appellee's recommendation of supervised, Zoom-only visitations by Father. Appellee had argued that "There were issues since this last hearing, not only directly after the hearing, but apparently father is making things difficult with [the] current caregiver, calling her a c*** in front of the children." J.F., who was now seven years old, reported that following her in-person visit with Father on January 10, 2025, he stated aloud he was going to kill mother. "And that [J.F.] had concerns that he would actually kill mother. [J.F.] recounted

8.

statements of violence that are historical in nature, including father pulling out a gun, other altercations, altercations between father and mother who were also having issues at that time." The juvenile court further ordered that Father submit to random substance abuse screens as requested by appellee, the guardian ad litem, or the juvenile court. The juvenile court then set a further dispositional hearing for April 24, 2025.

{¶ 16} Meanwhile, Father timely appealed the juvenile court's decisions, and on February 6 the juvenile court continued the April 24 further dispositional hearing due to those appeals.[3] On February 10, 2025, under App.R. 3(B), this court consolidated the three cases. Appellee did not file a brief in response to Father's brief.

## II. Law and Analysis

{¶ 17} In support of his first assignment of error, Father contends that the juvenile court hindered his parental rights because "by finding and continuing to penalize him at disposition for his children being deemed dependent and neglected under R.C. 2151.03 and 2151.04, [it] is unconstitutional as applied." Father urges this court as follows:

> [to view] this case from a lens which recognizes Amish or Hippie lifestyles as acceptable ways of life in the United States of America – *land of the free*. Also, consider known European lifestyles as it relates to hygiene norms – perhaps it's true the French do not prioritize deodorant, and the English do not prioritize brushing their teeth. Point being, please keep in mind that Huron County commonly known, typical hygiene and customary norms and ways of culture exist, but that does not mean adoption thereof is mandatory and enforceable by law. . . . Appellant clearly employs the *free-range* parenting style which allows for the children to be as independent as possible as early as possible. This parenting style builds on the

---

[3] The appeal for J.F. was assigned case No. H-25-0003; the appeal for N.F. was assigned case No. H-25-0004; and the appeal for R.G. was assigned case No. H-25-0005.

9.

independence of the child and in theory is to lead to children with higher self-esteem and self-efficacy – because they do for themselves. [Emphasis sic.]

{¶ 18} Father argues that "there was no competent, credible evidence in the record to find clearly and convincingly that appellant's children were dependent or neglected," although he admits, "[a]side from the dental issues and the hygiene issues." We disagree.

{¶ 19} As a preliminary matter, Father confuses the juvenile court's role in adjudicating the children as dependent and neglected. The juvenile court does not have any burden of proof; rather, the juvenile court is tasked with determining whether appellee satisfied its burden of establishing J.F. and N.F. as neglected, under R.C. 2151.03(A)(3), and J.F., N.F., and R.G. as dependent, under R.C. 2151.04(C). *In re Bn.J.*, 2024-Ohio-2282, ¶ 15 (6th Dist.). Nevertheless, we construe that Father argues appellee failed to meet its burden of proof by failing to take into consideration his self-labeled "free range parenting style."

{¶ 20} The juvenile court's adjudication of the children as neglected and dependent must be supported by clear and convincing evidence. *Id.* at ¶ 16. "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469, 471 (1954), paragraph three of the syllabus. We will not reverse the juvenile court's adjudication decisions of dependency and neglect where competent and

10.

credible evidence supports the findings of fact and conclusions of law. *Id.* at ¶ 17. Our review examines the record and determines if the juvenile court had sufficient evidence before it to satisfy appellee's clear-and-convincing burden of proof. *Id.*.

{¶ 21} R.C. 2151.03(A)(3) defines a "neglected child" as any child "whose parents . . . neglects the child or refuses to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well-being." We agree with the juvenile court that appellee presented clear and convincing evidence to support finding that J.F. and N.F. were neglected children through the testimony of five witnesses and the admission of one exhibit, which detailed the ongoing dental concerns for J.F. and N.F. The collective testimony revealed that food insecurity and hygiene problems daily plagued these children of only four, six, and eight years old. There was testimony that the collective impact of the children's late arrival to school, and the daily need to feed, clean, and clothe them, led to them receiving only forty-eight percent of their classroom time. And Father's own testimony showed he was only following through on their dental care through the dogged determination of concerned school personnel, a dental provider, and appellee.

{¶ 22} R.C. 2151.04(C) defines a "dependent child" as any child "whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." We agree with the juvenile court that appellee presented clear and convincing evidence to support finding J.F., N.F., and R.G. were dependent children through the testimony of the same five witnesses and the admission of one exhibit into

11.

evidence. The children's school personnel and non-family providers were already extensively involved in the daily care, feeding, and health monitoring of the children so that they could safely function during a school day.

{¶ 23} Father further argues that R.C. 2151.03(A)(3) and 2151.04(C) are unconstitutional as applied to him. "The determination whether a statute or ordinance is constitutional is a question of law that we review de novo." *City of Cleveland v. State*, 2019-Ohio-3820, ¶ 15. We begin by presuming the constitutionality of lawfully enacted legislation. *In re D.B.*, 2011-Ohio-2671, ¶ 21; R.C. 1.47. We reviewed the record de novo and find Father's constitutional challenge to R.C. 2151.03(A)(3) and 2151.04(C) as applied to his particular set of facts are pure speculation and not well-taken. There was no testimony by any witness, including Father, that he followed undefined "Amish," "Hippie" or "European" lifestyles as they pertain to his now self-described "free range parenting style." Nor was there any testimony by Father regarding the capacities of his four, six, and eight year old children to achieve the hygiene, dressing, eating, and transportation tasks necessary to arrive at school on time, well-fed, fully- and cleanly clothed, and pain-free so that they could participate in classroom learning. Father's self-described "free range parenting style" resulted in the children receiving only forty-eight percent of classroom learning.

{¶ 24} Father's first assignment of error is found not well-taken.

{¶ 25} In support of his second assignment of error, Father argues the juvenile court "incorrectly placed his children with a great uncle and his girlfriend who had no

12.

relationship with the children established in the record, and where the children's paternal grandmother was "fit and willing to take custody of the children." Father personally raised at the hearing the issue of the maternal uncle sleeping in the same room as the children without any further evidentiary support. Father concludes that reversal is mandated "because it is less intrusive into family affairs for temporary custody to go to grandma because she was fit and willing to take the children, and there was no evidence to support reasonable efforts were made for that placement or that, that familial placement with her was not in the children's best interest." We disagree.

{¶ 26} R.C. 2151.353(A)(2)(d) does not require the juvenile court to prioritize Father's mother over mother's uncle for temporary custody of the children, which states, "If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition: . . . (2) Commit the child to the temporary custody of any of the following: . . . (d) A relative residing within or outside the state." Mother's uncle, who was recommended by mother herself, satisfies R.C. 2151.353(A)(2)(d).

{¶ 27} Contrary to Father's arguments, his mother did not attend the adjudicatory hearing when temporary custody was decided, and the juvenile court did not find her "fit" and willing to take temporary custody of the children. Appellee testified that the paternal grandmother was uncooperative with their attempts to do a home study, which needed to include her unacknowledged live-in boyfriend. In contrast, a recent home study by Richland County was satisfactorily completed for mother's uncle and his girlfriend for which they have legal custody of another child.

13.

**{¶ 28}** Father's second assignment of error is found not well-taken.

### III. Conclusion

**{¶ 29}** We affirm the judgments of the Huron County Court of Common Pleas, Juvenile Division, which adjudicated J.F., N.F., and R.G. dependent children, adjudicated J.F. and N.F. neglected children, granted temporary custody of the children to the maternal uncle and his girlfriend under appellee's protective supervision, and granted Father supervised visitations over Zoom. Father is to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Charles E. Sulek, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.